UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLEISURE, INC.,

              Plaintiff,                          CIVIL ACTION NO.

       v.                                         1:12-CV-1260-CAP

ACE EVERT, INC.,

              Defendant.

## CLAIM CONSTRUCTION ORDER

This matter is before the court for construction of disputed terms in the

three patents at issue in this litigation.

## I.     Background

This patent action relates to outdoor umbrella products. Plaintiff

ATLeisure, Inc. (ATLeisure) was formed in 2011 to manufacture and sell

outdoor umbrellas. ATLeisure acquired the three patents at issue when it

purchased the umbrella assets of Southern Sales and Marketing Group in

2011. The patents cover technology used in offset (side supported) umbrellas

commonly used on patios and at pools. Specifically, U.S. Patent No. 5,937,882

(the ′882 patent) protects an invention relating to umbrellas that are

supported from the side and tilt; U.S. Patent No 7,604,015 (the ′015 patent)

protects an invention relating to umbrellas with structural ribs containing

lighting; and U.S. Patent No. 8,104,492 (the ′492 patent) protects an

invention relating to the mechanism by which umbrella canopy height and angle can be adjusted.

On April 12, 2012, ATLeisure filed this infringement action claiming that patio and outdoor umbrella products manufactured and sold by defendant Ace Evert, Inc. (Ace) infringe various claims of the three patents [Doc. No. 1].[1] Ace answered denying infringement, and it counterclaimed for a declaratory judgment of non-infringement and invalidity [Doc. Nos. 12, 23].

On October 5, 2012, pursuant to this Court's Local Patent Rules, the parties filed a joint claim construction statement [Doc. No. 31]. In that statement, they identified three disputed terms: "operating element" as contained in the ′882 patent; "bulb" as contained in the ′015 patent; and "locking means" as contained in the ′492 patent. Each party filed an opening brief in support of its proffered construction of the disputed terms [Doc. Nos. 37, 38], followed by a response brief in opposition to the other party's opening brief [Doc. No. 46, 45]. Accordingly, the proposed constructions are now ripe for the court's review.

---

[1] ATLeisure originally asserted claims under another patent. It dismissed that claim and amended its complaint to assert the three patents described above on June 22, 2012 [Doc. Nos. 19, 20].

 II.   **Claim Construction Standard**

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995). It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Generally, the words of a claim are given their ordinary and customary meaning, which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312–13 (citation omitted). The person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification, rather than solely in the context of the particular claim in which the disputed term appears. *Id.* at 1313

In some instances, the meaning of a claim term as understood by one of skill in the art "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. In many instances, however, the court must go further than the readily understood meaning. In such cases, sources available to the public aid the

court in determining the meaning of claim language. *Id.* These sources

include "the words of the claims themselves, the remainder of the

specification, the prosecution history, and extrinsic evidence concerning

relevant scientific principles, the meaning of technical terms, and the state of

the art." *Id.* (quoting *Innova*, 381 F.3d at 1116).

"[T]he claims themselves provide substantial guidance as to the

meaning of particular claim terms." *Id.* Both "the context in which a term is

used in the asserted claim" and the "[o]ther claims of the patent in question"

are useful for understanding the ordinary meaning. *Id.*

The specification is "always highly relevant to the claim construction

analysis. Usually, it is dispositive; it is the single best guide to the meaning of

a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90

F.3d 1576, 1582 (Fed. Cir. 1996)). In short, the claims "must be read in view

of the specification, of which they are a part." *Markman*, 52 F.3d at 979.

Thus, "[t]he construction that stays true to the claim language and most

naturally aligns with the patent's description of the invention will be, in the

end, the correct construction." *Phillips*, 415 F.3d at 1316 (quoting *Renishaw*

*PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). In

some instances, the specification may reveal the inventor making "an

intentional disclaimer, or disavowal, of claim scope, [and therefore] the

inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

In construing claim terms, the court should also consider the patent's prosecution history. *Id.* at 1317 ("Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."). However, unlike the specification, the prosecution history "represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation." *Id.* For that reason, the prosecution history "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Nonetheless, under the doctrine of prosecution disclaimer, the inventor may have limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be according to the claim language itself. *Id.*; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution." (internal quotation marks omitted)).

Finally, the Court may also rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history. *Phillips*, 415 F.3d

at 1317. However, external evidence is generally less reliable than the intrinsic record. *See id.* (discussing the limitations of extrinsic evidence). Therefore, an analysis of intrinsic evidence is usually sufficient to construe a disputed claim term, and if the intrinsic evidence is sufficient to resolve disputed claim terms, "reliance on any extrinsic evidence is improper." *Id.*; *see also Vitronics*, 90 F.3d at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence . . . .").

## III. Analysis

As an initial matter, the court notes that it construes the terms below without conducting a hearing. *See* Patent L.R. 6.6 ("[T]he Court shall conduct a Claim Construction Hearing *to the extent the Court believe[s] a hearing is necessary* for construction of the claims at issue." (emphasis added)). "*Markman* does not require a district court to follow any particular procedure in conducting claim construction. . . . [S]ome courts have found it useful to hold hearings and issue orders comprehensively construing the claims in issue," but "[s]uch a procedure is not always necessary." *Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001); *see also J.G. Peta, Inc. v. Club Protector, Inc.*, 65 F. App'x 724, 727 n.2 (Fed. Cir. 2003) (stating that the Federal Circuit "has never held that district courts

must conduct evidentiary hearings as part of the claim construction process"

and holding the district court did not err in declining to conduct a hearing

where the technology was "simple" the claim language was "relatively

straightforward"). The court concludes a hearing not necessary in this case

because the technology is simple and the arguments and evidence presented

in the parties' claim construction briefs lead to a straightforward conclusion

regarding the terms' meanings.

The parties dispute three claim terms—one term in each of the three

patents at issue. The court will address each disputed term now.

## A.    Operating Element

The first disputed term for construction is "operating element" of Claim

4 (and dependent claims 5 and 6) of the '882 patent. Claim 4 covers an:

> Umbrella apparatus supported at one side for tilt adjustment
> with respect to the side support, comprising:
>> a mast . . .;
>> a member associated with the mast and selectably moveable
>>> thereon to a plurality of positions . . .;
>> an umbrella canopy . . .;
>> an arm associated with the central region of the umbrella
>>> canopy . . .;
>> an element associated with the arm at a location thereon
>>> between the central region of the umbrella canopy and the
>>> outer end of the arm . . .;
>> stop elements associated with the mast at a plurality of
>>> locations between the lower and upper locations . . .; and
>> an **operating element** selectively operable to move the
>>> member along the mast to an extent defined by the stop
>>> element, and operatively associated with the umbrella

> canopy to open or close the umbrella canopy in response to movement of the operating element with the member stopped at a predetermined location on the mast,
>
> whereby tilt and selective opening of the umbrella canopy are accomplished independently of each other by the operating element.

′882 patent col. 7, ll. 12–45.

Plaintiff ATLeisure contends the term "operating element" means "a pulley system." Defendant Ace contends the term has a much more specific meaning:

> [T]he "operating element" comprises a crank, connected to a first pulley, and having an associated line which initiates from the first pulley, and which line passes upward through the interior of the mast, up and over a second pulley disposed at the top of the mast, and therefrom down and under a third, lower pulley connected to the member, thereby to move the member along the mast.

Def.'s Cl. Construction Br. 6 [Doc. No. 38]. Although couched as a dispute, the parties effectively agree on the meaning of the term operating element. First, they cite the same intrinsic evidence, a portion of the specification, in support of their proposed constructions. *Compare id.* at 9, *with* Pl.'s Cl. Construction Br. 4–5 [Doc. No. 37] (both quoting ′882 patent col. 4, ll. 52–65, describing a "line" through a system of "pulley[s]"). In fact, Ace's proposed construction is merely a quotation of that portion of the specification, which of course itself describes a pulley system. Accordingly, the court construes the term operating element to mean "a pulley system."

### B.   Bulb

The second disputed term for construction is "bulb" in independent

Claim 1 and dependent claims 2, 4, and 5 of the ′015 patent. Claim 1 covers

an:

> [U]mbrella, comprising:
>     a first support member;
>     a plurality of elongated ribs supported by said first support
>         member; and
>     a canopy supported by said plurality of elongated ribs,
>     wherein at least one of said plurality of elongated ribs has, in
>         cross section,
>         a bottom wall;
>         a first upstanding side wall . . .;
>         a second upstanding side wall . . .;
>         a web extending between said first and second side walls
>             . . .;
>         a first hole extending through said web; and
>         a second hole extending through said bottom wall generally
>             in coaxial alignment with said first hole;
>     a **bulb** extending from below said second hole, up through said
>         cavity, to said first hole, whereby the bulb may be readily
>         accessed from said channel for insertion into or removal
>         from said cavity, and
>     wherein an electrical conductor runs from the bulb along said
>         channel, to a source at electrical power.

′015 patent col. 4, ll. 15–41. Additionally, Claim 5 claims "[t]he umbrella of

claim 1 wherein the **bulb** comprises a light emitting portion and a separable

housing portion." *Id.* at ll. 50–51.

Plaintiff ATLeisure contends the term "bulb" means "a lighting device

that comprises a light, a casing, and an electrical conductor." Defendant Ace

contends a bulb means "an elongated light-emitting body extending from the distal end thereof, and said light-emitting body itself extending from below a second hole up through the cavity to a first hole."

The court concludes ATLeisure's proffered construction is the one that most naturally aligns with the specification's description of the invention. *See Phillips*, 415 F.3d at 1316. First, the rib supporting the umbrella canopy is described as having "first and second substantially coaxial openings" that are "configured to house an electrical component, such as a light . . . as illustrated in [Figure] 5." '015 patent col. 2, ll. 64–67, col. 3, ll. 2–3. In the detailed description of Figure 5, the specification provides that "the light . . . is contained within a casing . . . configured to mount flush inside" the top openings. *Id.* at col. 3, ll. 13–15. Further, the light can be "a light emitting diode (LED), incandescent bulb, florescent lamp, or other appropriate light source." *Id.* at col. 3, ll. 4–6. Finally, the examiner cited another U.S. Patent Publication as prior art, which had "showed a bulb comprising a light emitting portion (7) and a separable housing portion (71)." Jan. 14, 2008 Office Action at 4 [Doc. No. 32-5 at 31]. The examiner's disclosure of the prior publication is additional intrinsic evidence of what was known to be a "bulb" by a person of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1317 ("The prosecution history, which we have designated as part

10

of the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."). Thus, in light of the specification, the term "bulb" in the patent's claims is interpreted most naturally as "a lighting device that comprises a light, a casing, and an electrical conductor."[2]

On the other hand, Ace Evert's proposed construction of the term bulb—"an elongated light-emitting body extending from the distal end thereof, and said light-emitting body itself extending from below a second hole up through the cavity to a first hole"—finds no support in either the evidence or its own argument. As an initial matter, Ace's begins its purported exposition by citing Merriam Webster's Dictionary and Wikipedia in support of its construction. *See* Def.'s Cl. Construction Br. 11–12 [Doc. No. 38]. In this regard, Ace turns years of Federal Circuit precedent regarding the proper interpretation of patent claims upside down and on its head. The court finds these non-scientific dictionaries not dispositive and not particularly helpful here, especially when more reliable and relevant evidence is available. *Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1372 (Fed. Cir. 2001) (cautioning "against the use of non-scientific dictionaries, 'lest dictionary

---

[2] This definition also agrees with even this lay judge's understanding of the common household light bulb, which indeed has a light (the filament), a casing (the glass portion housing the light) and an electrical conductor to supply energy to the light.

definitions be converted into technical terms of art having legal, not linguistic

significance.'" (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d

1473, 1478 (Fed. Cir. 1998)). Moreover, while Ace mocks the plaintiff's

(supposedly) "illogical attempt to pervert the clear definition of a 'bulb'" as

including a casing and conductor, Def.'s Cl. Construction Br. 14 [Doc. No. 38],

and make the useless observation that "the Emperor has no clothes," it is in

fact Ace's own argument that is illogical. The court can discern no basis for

adopting Ace's proposed construction. For example, while it contends the bulb

should be construed as an "elongated light-emitting body extending from the

distal end thereof," Ace never explains why the bulb should be "elongated,"

why it must extend from the distal (as opposed to proximal, one supposes)

end, or, most importantly, what justification Ace has for inserting the word

"itself" into the language of the claim. For these reasons, the court reject's

Ace's proposed construction of the term "bulb" and adopts ATLeisure's.

### C.   Locking Means

The final disputed term is "locking means" as used in Claim 1 (and

dependent Claims 4–7) of the ′492 patent. The patent claims, in pertinent

part:

> An umbrella comprising:
>     a main pole having a lower end for support by a support
>         surface and extending generally upward to an upper end;

12

> a sliding member associated with the main pole and selectably
> moveable thereon between lower and upper locations along
> the main pole;
> **<u>locking means</u>** for releasably securing the sliding member to
> the main pole at a selected location along the main pole;
> an umbrella canopy . . .;
> . . . ; and
> wherein the angle of the umbrella canopy with respect to the
> main pole can be controlled by moving the sliding member
> along the main pole.

'492 patent col. 4, ll. 47–56 and col. 5, ll. 8–11.

ATLeisure contends the term "locking means" should be "afforded its plain and ordinary meaning." Pl.'s Cl. Construction Br. 3 [Doc. No. 37]. Ace again argues in support of a much more detailed interpretation, contending a locking means is "a graspable, but non-thumb-operable, spring-loaded latch pin disposed at the bottom of the sliding member, wherein said latch pin is disposable into a series of predetermined indentations that do not pass completely through the mast surface." Def.'s Cl. Construction Br. 19 [Doc. No. 38].

As an initial matter, the court disagrees with Ace's position that ATLeisure waived any argument in support of its position. Ace correctly observes that ATLeisure inexplicably failed to provide an argument in support of this contention aside from a naked citation to one page of the Report and Recommendation of a Special Master, later adopted as the opinion and order of this court, which in turn largely contained a block

13

quotation from *Phillips*. *See* Pl.'s Cl. Construction Br. 3 [Doc. No. 37] (citing

*Fort James Corp. v. J.H. McNairn, Ltd.*, No. 1:04-CV-3000-CAP, 2006 U.S.

Dist. LEXIS 36528, at *6 (N.D. Ga. Apr. 4, 2006) (Report and

Recommendation of Special Master). Ace argues in its response brief that

ATLeisure "should be judicially estopped from making any argument in its

second brief regarding the ′492 patent claims." Def.'s Cl. Construction Br. 10–

11 [Doc. No. 38] (citing *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d

1559, 1566 (Fed. Cir. 1997) (holding the defendant had waived an argument

regarding improper venue by failing to raise it in the opening appeal brief).

Aside from the fact that this is not an appeal, ATLeisure *has* previously

stated its position (and the legal basis for it) on the record. *See* Joint Cl.

Construction Statement, ATLeisure's Preliminary Constructions 5–6 [Doc.

No. 31-1] (citing 35 U.S.C. § 112 ¶ 6); [Doc. No. 32, at 9] (same). Additionally,

as discussed below, Ace's proposed construction of this term is contrary to the

Patent Act's prescribed construction for such "means plus function" claims.

A term in a claim that is "expressed as a means or step for performing a

specified function without the recital of structure," like the "locking means"

here, "shall be construed to cover the corresponding structure, material, or

acts described in the [patent's] specification and equivalents thereof." 35

U.S.C. § 112 ¶ 6 (2006). The specification here describes three embodiments

14

of the "sliding member" that is releasably secured to the main pole via the locking means. *See* '492 patent Figures 4, 7, 8. Therefore, § 112 ¶ 6 allows ATLeisure's locking means to cover those three disclosed structures *and* their equivalents.

Ace's proposed interpretation of the term would require elements of the locking means that are not present in some of the disclosed embodiments, so it cannot be the correct. *See* Pl.'s Resp. to Def.'s Cl. Construction Br. 12 [Doc. No. 45] ("For example, Fig. 4 does not have a spring-loaded latch pin. Nor, [sic] is the pin at the bottom. Further, in Fig. 8, the device uses a plurality of ratchet teeth."). Instead, Ace appears to have focused on one alternative embodiment of the invention (from Figure 7), ignored the other embodiments, and then added limitations to the claims to suit its non-infringement contentions.[3] Ace's definition of locking means impermissibly eviscerates disclosed embodiments from the specification and imports limitations made up whole cloth. Thus, the court agrees with ATLeisure, and the term "locking means" should be afforded its ordinary meaning consistent with § 112 ¶ 6.

---

[3] For example, Ace contends it does not need to provide "additional constructions" with regard to the other embodiments because they "do not correspond to any *accused structure*." Def.'s Cl. Construction Br. 21 n.3 [Doc. No. 38] (emphasis added).

## IV.    Conclusion

For the reasons set forth above, the court construes the three disputed

claim terms as described.

**SO ORDERED** this 20th day of May, 2013.


<u>/s/ Charles A. Pannell, Jr.</u>
CHARLES A. PANNELL, JR.
United States District Judge

16