IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ATLEISURE, INC.,              )
                              )
        Plaintiff ;           )
                              )
vs.                           )      CASE NO. 1:12-CV-1260 CAP
                              )
ACE EVERT, INC.,              )
                              )
        Defendant.            )


HEARING ON MOTION FOR PRELIMINARY INJUNCTION


Wednesday, May 22, 2013


BEFORE THE HON. CHARLES A. PANNELL, JR.


APPEARANCES:


ON BEHALF OF PLAINTIFF:      Steven G. Hall
                             Robert G. Brazier


ON BEHALF OF DEFENDANTS:     Robert M. Ward
                             Heng Wang

Reported by:
Martha J. Frutchey
U.S. District Reporter
Room 2314, U.S. Courthouse
75 Spring Street, SW
Atlanta, Georgia  30303-3369
(404) 215-1573

**Wednesday, May 22, 2013**

1
2        THE COURT:  All right.  Sound case 12-CV-1260, ATLeisure
3   versus ACE Evert, Incorporated, and others, set down today
4   mainly to hear the plaintiff's motion for a preliminary
5   injunction.  But before I get to that, let me have the attorneys
6   identify themselves on the record; attorneys for the plaintiff.
7        MR. HALL:  Good afternoon, Your Honor.  I'm Steve Hall.
8   With me is Robert Brazier.  I'd also like to introduce, we have
9   got three summer associates who are in and visiting us.  They
10  are Nicole Griffin, Melissa Fox and Matthew Leonard.  And with
11  me is my client's representative, Bill Browne.
12       THE COURT:  All right.  Thank you.  Where did they go to
13  law school?
14       MR. HALL:  One is Emory, I know.  Two Emory's and one
15  Duke.  Mississippi, Emory, and Duke.  Old Miss, Duke and Emory.
16  I keep shutting the Duke out of my mind, being I'm a Carolina
17  grad, Your Honor.
18       THE COURT:  Well, the one at Old Miss will probably get
19  the best education.  All right.  Who's here on behalf of the
20  defendant?
21       MR. WARD:  Good afternoon, Your Honor.  Bob Ward for ACE
22  Evert and my colleague.
23       MR. WANG:  Good afternoon, Your Honor.  Heng Wang from
24  Heng Wang and Associates.  I represent the defendant, ACE Evert,
25  in this matter.

1          THE COURT:  All right.  Thank you.  Well, let's see.

2     We'll proceed on the motion for a preliminary injunction, but

3     before we do, maybe I can save us all some time.

4          Last night at some point the defendant filed a Motion

5     for Reconsideration of the Court's May 20th Claim Construction

6     Order that's at docket 86.  The Court plans to deny that motion

7     for several reasons I'll put on the record now.

8          One.  The defendant has pointed to no clear error or law

9     to justify reconsideration.  Two.  The case that the defendant

10    cites, Ishida Company versus Taylor, says the Court does not

11    need to provide separate constructions for each disclosed

12    embodiment, the way the Court reads it.  Three.  Rather, the

13    Federal Circuit held Section 112, paragraph 6 requires only

14    identification of the structure or structures in the

15    specification that perform the recited function.  That's at page

16    1316 of that case.

17         Next, the Claim Construction Order identified figures 4,

18    7 and 8 as of the specification as the structures that perform

19    the locking function.  Let's see, what am I up to?  Five?  The

20    defendant wants language from the specification describing the

21    embodiment of the ATLeisure -- embodiment ATLeisure has asserted

22    against it used for jury instructions.  It's not time for jury

23    instructions.  You can make the proper motion at that time.  For

24    all of those reasons, the Court will deny that motion.

25         Also, now, the Court, excuse me, the defendants filed a

1   Motion for Summary Judgment last night also about lack of

2   standing.  That's at docket 87.  The Court will wait for a

3   response on that motion, unless you want to be heard.  I mean,

4   you can file a Motion for Summary Judgment for lack of standing,

5   I suppose, at any time.  First thought was it's not time for

6   Motions for Summary Judgment.  They want us to address that now,

7   I guess we can.

8        MR. HALL:  Your Honor, on behalf of the plaintiff, I

9   think we'll just file a response.  I think it is something that

10  will be easily handled on the briefs.

11       THE COURT:  I think you also have two motions for

12  discovery pending, which we'll rule on in due course.

13       Now, that gets me to the Motion for Preliminary

14  Injunction, which the plaintiff has the burden to proceed.  Let

15  me see if I can save you some time.  There are several elements

16  before the Court can issue such an injunction.  Really, four;

17  likely to succeed on the merits, likely to suffer irreparable

18  harm in absence of preliminary relief.  Three, balance of equity

19  tips in favor of the plaintiff, and finally, that the injunction

20  is in the public interest.  I am focused on the element of

21  irreparable harm.  Do you wish to proceed for the plaintiff?

22       MR. HALL:  Yes, sir, Your Honor, we do, and thank you

23  for narrowing the issues.  Your Honor, I take it from your

24  ruling, I hope I'm understanding it correctly, should we just

25  jump straight to irreparable harm on this one?

1        THE COURT:  I'd appreciate it.

2        MR. HALL:  Glad to do it, and that will make us a lot

3   quicker.  Your Honor, I did not start off as a patent attorney,

4   and these are not always the waters that I am in.  I'm more of a

5   generalist.  But what I do note with some happiness as I get

6   into these things and stop swimming around in the patent issues

7   is that when you come to preliminary injunction, the test is

8   very much the same as it is for any other case that we would do.

9        And we have covered a lot of this in our briefs, but

10  focusing straight in on the question of irreparable harm.  Your

11  Honor, in our briefs, and it's our position that this really is

12  the quintessential case for irreparable harm and where

13  irreparable harm is demonstrated.

14       And, first of all, I should probably just touch on, I

15  know the Court is probably more familiar with this than me,

16  however, the test for what is irreparable harm is essentially

17  harm that cannot be sufficiently compensated by money or a later

18  decision on the merits, as I think we all know.  And I have

19  cited in my brief to the Canon decision for that, Your Honor.

20       But when we look at it, and we all know what these are

21  very often when we see things that are the typical ones, such as

22  loss of real property and things of that nature.  But the

23  Court's have looked at the question of what can constitute

24  irreparable harm in the patent context in a number of different

25  ways.

1          Now, first, let me address the issue that's ongoing and

2     that's out there and was mentioned in both of the briefs.

3          THE COURT:  Let me ask you something.  Do you want to

4     present any evidence today on that issue?

5          MR. HALL:  Your Honor, thank you.  My plan today was to

6     present the evidence that's in the affidavits.  We believe it is

7     very well laid out.

8          THE COURT:  All right.

9          MR. HALL:  We have brought two witnesses with us who are

10    prepared to present in rebuttal, and if there are questions,

11    because the affidavits were filed, you know, four or five months

12    ago, if there are questions as to whether or not the predictions

13    that were made in the affidavits have been coming into fruition,

14    they are prepared to testify as to that.

15         But it's my belief that if the defendants are not

16    putting up anymore evidence than they have already, then

17    definitely the affidavits, we think, are adequate to demonstrate

18    it, and all these witnesses would do is confirm that the things

19    they predicted have happened, and give some real specifics to

20    the numbers that they are seeing and give some updates.

21         THE COURT:  Okay.  Well, I interrupted you.  Go ahead.

22         MR. HALL:  Thank you, Your Honor.  There is an ongoing

23    question that I'll mention first, and we are not traveling under

24    it, but I do think it is worthwhile to mention, and that is this

25    question that's mentioned in our briefs as to whether or not

1    there is a presumption of irreparable harm.

2          THE COURT:  Well, I don't believe there is.  I mean, I

3    have trouble with that sometimes.

4          MR. HALL:  And I understand that, Your Honor, and we

5    recognize that that presumption is in question, which is why we

6    are not traveling under it.  The only thing I would note on it

7    very briefly is there can be a good reason for having such a

8    presumption at the preliminary stage versus at the permanent

9    injunction stage, which has been addressed, and that is that it

10   can be a little bit more difficult very early on in the case to

11   predict in some instances if you are going to have irreparable

12   harm, and I think ultimately we'll just have to see how the

13   Courts turn out and handle that at the end of the day.

14         So putting that aside, however, and moving straight to

15   the question of what evidence we have of irreparable harm, what

16   I would say to characterize it overall is it's compelling.  It

17   is virtually completely un refuted by the defendants, although

18   they do throw out a couple of statements such as this is not

19   supported, or our company has a lot of money, and those types of

20   things.

21         But the points that courts have looked at in these

22   situations to look and see what is irreparable harm, what can't

23   be compensated with money.  One of them is a threat that goes to

24   the potential survival of the business.  If you are going to

25   lose the business, or have a good potential to lose the

1  business, that is irreparable harm.  And I would actually say it

2  is irreparable harm in a couple of different ways.  One being

3  that you are going to lose the business.  Two, if you actually

4  do lose the business, it is extraordinarily difficult to

5  quantify what that business would have made when you go back at

6  the end of the day and try to look at it.

7       For instance, if these guys go out of business two

8  months from now, how will we know what damages, what different

9  product expansions they would have gone into years from now?  So

10 we have got a situation where you simply can't quantify that.

11      Number two.  There is irreparable harm where there is a

12 loss to reputation.  And I'll give an example of that, Your

13 Honor.  If you look at AOL, AOL, as a company.  In the

14 beginning, AOL was a phenomenally successful company.  It has

15 lost that reputation.  It cannot get it back again.  How would

16 an AOL quantify the value of that loss?

17      Another factor, and I'm citing, Your Honor, from the

18 Robert Bosch, and I think it's B-o-s-c-h, case that we have

19 cited in our brief.  It's 659 F.3rd 1142.  And another example

20 it talks about is loss of market share.  It talks of loss of the

21 expense in developing your market share.  And it talks about, as

22 I have mentioned, quantification of damage and encouragement of

23 others to then come in and compete as well.

24      And we believe that in this case we have presented

25 evidence showing all of these factors, and I think it's the

1    easiest way --

2         THE COURT:  Well, what you presented so far is pretty

3    speculative, isn't it?

4         MR. HALL:  Well, Your Honor, I think that's very much

5    the issue that you are having to deal with, and perhaps it will

6    make some sense to call these guys and move it from the more

7    speculative where we were back then to getting it more into

8    exactly where we are right now, because that may make some

9    sense, Your Honor, and I think it's a very easy and short thing

10   that we can put up and talk about.

11        But let me talk about, I think, the framework that we

12   are in, and from there I think it gets pretty easy to understand

13   why this is what's happening and why it's logical that this is

14   what's happening.

15        This is a very new company.  It is trying to get into a

16   market that is highly competitive.  Its one advantage coming in

17   is it's got these patents on products that are not out there

18   being sold.  And that's incredibly important for a new company

19   that's trying to earn brand reputation, trying to develop good

20   will with these customers, and they are just primarily dealing

21   with these big players that are out there.  And they have come

22   in, they've paid a lot of money to get these patents.  They paid

23   five million, the affidavit tells us, to get them, and they are

24   in there and they immediately come in with a pretty good pop in

25   the first year.

1          They have captured 25 percent of the market.  They have

2    made 12 million in gross sales; 90 percent that are products

3    that are covered by these patents, and they are beginning to

4    build that reputation, and they are beginning to build it

5    because they have got a unique product.

6          You have got two things in this world when you are

7    trying to go to these big retailers.  You either have a unique

8    and new product that they want that nobody else has and you earn

9    your reputation with that, or you are cutting on price and you

10   are earning your reputation with cutting on price.

11         Well, our guys, coming into this right now where they

12   are situated, is they are coming in under the avenue of a new

13   innovative exclusive product, and quite frankly, they are

14   carrying a heck of a purchase price on that product -- on the

15   rights to that product, so they can't compete on price with the

16   others.  They have got to carry the 5 million dollar investment

17   to buy these -- the rights to these umbrellas.  So the only way

18   they get in and capture that market share and make it is to have

19   the exclusivity of their product.

20         And what happens -- and I'll put up my witnesses to talk

21   about this.  What we have seen happen is that as soon as there

22   is an erosion in that exclusivity, not only do you lose it with

23   respect to your direct competitor, who is coming in and

24   violating your patent, but there is a very big likelihood of

25   copycat competitors coming in, because now they see a market

1   where there is more than one product, there is not a licensed

2   product, and it essentially opens the door to these things

3   coming in.

4         So what we believe is happening here is, number one, we

5   are losing the ability to gain our reputation in a critical

6   beginning part.  And when you turn around and you look at that,

7   how do you quantify that?  How do you quantify if Apple, when

8   looking at Apple where it is right now, if Apple had introduced

9   its iPhone, and another competitor introduced the iPhone at the

10  same time?  Would Apple be anything like they are now?  Would

11  they have anything like that invaluable reputation that they

12  have now?

13        Now, obviously, we are not Apple, and we are not dealing

14  with that type of thing, but the principle remains there.  This

15  is -- and so we think we are losing that.

16        Number two.  This company, the affidavit lays out, had a

17  core product line.  This is it.  It was 90 percent of its

18  business, and it's now facing illegal attack in that 90 percent

19  of its business directly towards the same customers in that very

20  business, and it's carrying a lot of debt service.  How then can

21  it survive as a business other than by going into other products

22  and attempting to diversify, which they've indicated that they

23  are trying to do, which my client, when I put him up, will talk

24  about, is very difficult and unsuccessful, and so they are faced

25  with losing this business as well.

1        And as I have said before, if that doesn't constitute

2   the definition of what would be irreparable harm in a patent

3   context, the question becomes what possibly could?  You know,

4   obviously, you go to your law school exam and you talk about the

5   example where the guy -- there is a dispute over who owns the

6   Van Gogh and one guy wants to set it on fire.  Well, if you let

7   him do that, that is clearly irreparable harm.  But that's never

8   going to be the case in a patent.  In a patent situation, the

9   irreparable harm has always got to have an economic component to

10  it, and the cases, I believe, are well-trodden that when you

11  lose the market share, when you suffer the potential loss of a

12  full business, and when you are not allowed to come in and

13  establish your reputation and maintain it, that that constitutes

14  irreparable harm.

15       And that's my opening, Your Honor.  I would go ahead and

16  call my witness, or as the Court directs, allow opposing counsel

17  to make an opening, and then go pursuant to however the Court

18  would like.

19       THE COURT:  Well, let's see if defense counsel wants to

20  make an opening now or later.

21       MR. WARD:  Yes, sir, Your Honor, if it please the Court.

22       THE COURT:  Proceed for the defendant.

23       MR. WARD:  Your Honor, Bob Ward for defendant, ACE

24  Evert.  Unlike counsel, I have done solely patent and IP

25  litigation for 42 years, and if that causes me every now and

1    then to take a shortcut, or make an unwarranted presumption

2    about this or that, I apologize.  I certainly don't mean to do

3    that.

4            It seems that the evidence in the case is really what

5    should control here and not the speculations or arguments of

6    lawyers.  On the subject of irreparable harm, this case is a

7    year old, more than a year old.  The motion is stale.  It's more

8    than seven months old.  The reasons stated in the motion, I

9    would refer the Court particularly to paragraph 5, the Bliss

10   affidavit states that big box retailers would be making their

11   decisions on purchase for the 2014 selling season between March

12   and May of this year.  Well, that time has come and gone, and if

13   there had been some big emergency, it certainly no longer exists

14   on that basis.

15           There has been this contention that they have lost

16   business.  They have lost the Bed, Bath and Beyond business

17   specifically.  Well, again, the evidence is clear that Bed, Bath

18   and Beyond was never their customer.  That is our customer.

19   They have talked about losing the business.  What loss?  What

20   business?  They never had the business.  What is there to say

21   that but for ACE Evert's sales to Bed, Bath and Beyond, that

22   they somehow would have gotten that business?  Where is the

23   proof of that?  Of course, there isn't any proof.  And the

24   reason why is because there are twelve to fifteen other

25   companies out there all selling quality products, and all, by

1    the way, just like the plaintiff's product, made in China, just

2    like our product, made in China, just like their company, owned

3    by Chinese people, just like our company, owned by Chinese

4    people.

5           So you have got a marketplace out there that has a

6    multiplicity of competitors in it, and they would like the Court

7    to believe their speculative argument that somehow but for our

8    sales, they would have made those sales.  There is no evidence

9    whatsoever that would support that.  In fact, that's not true.

10   So their whole case for alleged irreparable harm vanishes on

11   those grounds alone.

12          Now, they have also backed their way into equities in

13   their argument.  They said they've spent money.  I suppose they

14   did spend money.  Our clients spent money too.  Our client spent

15   money on R and D as well.  There is absolutely no proof

16   presented that somehow our client took a free ride on them.

17   It's not the case whatsoever.  Counsel argues without proof,

18   again, with the speculation that somehow ACE Evert has undercut

19   them on price.  That is not true.  ACE Evert did not undercut

20   them on price.  ACE Evert offered a product based on what the

21   market dictated it should offer the product for, and that inures

22   to the public benefit.  There is absolutely nothing unfair in

23   that.

24          So they have also -- counsel also alluded to a loss of

25   reputation.  Again, there is no evidence that ACE Evert has done

1   anything to hurt anyone's reputation.  There is no count in this

2   case for unfair competition.  There is no count for defamation.

3   There hasn't even been any responsible allegation that somehow

4   ACE Evert's product is inferior or ACE Evert is somehow engaged

5   in some kind of unfair activity that would taint this

6   marketplace.

7           Let's see if I have anything else here to rebut, Your

8   Honor.  Give me just a moment.

9           THE COURT:  Well, as I understand your contention, the

10  only people you sold to are Bed, Bath and Beyond, and that's

11  somebody that the plaintiffs never sold to and there is no

12  indication they are going to.

13          MR. WARD:  Yes.  Why would Bed, Bath and Beyond buy from

14  them when they can buy from twelve to fifteen other people, and

15  if you believe counsel's argument that they have to produce a

16  high-priced product, why would anyone buy it?

17          THE COURT:  Well, my point is that they haven't lost any

18  business, because they never had that business before.

19          MR. WARD:  I agree with Your Honor, absolutely, and they

20  are not going to get that business either, because it is going

21  to go to other competitors who are offering a product at a lower

22  price that has nothing to do with these patents.  It's just a

23  speculation -- well, it's not a speculation, it's a ridiculous

24  argument that somehow Mrs. Smith out here has to buy a patented

25  product when she buys a patio umbrella.  She doesn't have to buy

1   these products at all.  She doesn't even care if they have these

2   features.  She'll buy something else.  So anyway, that's all I

3   have at this time, Your Honor.  Thank you.

4         THE COURT:  All right.  Proceed with your evidence.

5         MR. WANG:  Your Honor, may I add a few points?

6         THE COURT:  I'm sorry.

7         MR. WANG:  Thank you so much, Your Honor.  Your Honor, I

8   just wanted to add a few more points.  First of all, we object

9   to the plaintiff's proposal to take testimony of witnesses.

10  This is not an evidentiary hearing, unless we are provided with

11  the same opportunity to provide our own witnesses.  I think at

12  this time the Court should not take -- allow counsel to take

13  witnesses.

14        THE COURT:  I set it down for hearing.

15        MR. WANG:  I think it's a motion hearing.  It's not an

16  evidentiary hearing.

17        THE COURT:  Proceed.

18        MR. WANG:  Okay.  Your Honor, as to the plaintiff's

19  argument that they have lost business, which is hard to

20  quantify.  Your Honor, I think that a declaration submitted by

21  plaintiff's vice president, Mr. Jason Bliss, affirms that BBB,

22  Bed, Bath and Beyond, is not a customer of plaintiff.  And the

23  argument that the patent holder may lose business in general, I

24  think that is the same thing in every patent case, and the

25  plaintiff has not provided any evidentiary proof in this

1    particular case to justify that.

2          And I want to remind the Court that preliminary

3    injunction is a type of drastic relief where the movant bears

4    the burden, a very heavy burden, to prove that they are entitled

5    to such proof.  Your Honor, respectfully, plaintiff does not

6    meet the burden providing any evidence that justifies this

7    motion in terms of irreparable harm.

8          Further, Your Honor, the plaintiff argues that it did

9    very well initially and it acquired 25 percent of the market

10   share.  They did very well without having Bed, Bath and Beyond

11   as a customer.  Bed, Bath and Beyond is not their customer.

12   There is no reason to believe my client, who sells the products

13   solely to Bed, Bath and Beyond, their business activities will

14   have anything to do with how well the plaintiff's business is,

15   and there is no reason to doubt that the plaintiff can continue

16   doing well without Bed, Bath and Beyond as a customer.

17         And also, Your Honor, plaintiff will argue that they

18   spent time, they spent money on developing this product.

19   However, we submitted a declaration signed by the general

20   manager of the manufacturer in China saying that he's the one

21   that directed the research and development team, and they spent

22   a ton of money and efforts developing this product.  At least,

23   Your Honor, the Court should consider the submission to give the

24   same weight to the submission of plaintiff, both plaintiff's

25   submission and defendant's submission, however, it is the

1    movant, the plaintiff that bears the burden.  It's a heavy

2    burden they have to meet for them to get a preliminary

3    injunction.  Respectfully, Your Honor, they have not submitted

4    any evidence to show that they meet that burden.

5          In addition, Your Honor, the irreparable harm element.

6    I think the evidentiary proof that plaintiff has is solely just

7    the declaration of Mr. Jason Bliss.  However, Your Honor, if you

8    take a look at this declaration, it is full of generalized

9    information and speculation.  In a patent litigation case, to

10   argue preliminary injunction, the movant has to provide specific

11   information to show why in this particular case the movant is

12   entitled to the drastic relief that it asks for.  The general

13   information the plaintiff relies on to argue irreparable harm

14   includes the following:  The first item, 2011 report to Congress

15   on China's WTO compliance.  That doesn't show why in this

16   particular case we have either infringed their patent or we have

17   otherwise done anything wrong.

18         Plus, Your Honor, the plaintiff's parent company is also

19   a Chinese corporation based in China, and I think we cited prior

20   art, which is the patent of another competitor, Yotrio.  That

21   prior art with an earlier filing date basically shows other --

22   basically is identical in all material aspects.  The 2011 report

23   to Congress on China's WTO compliance, I don't think that is a

24   factor that would favor the plaintiff.

25         And also, Your Honor, the speculation of the business in

1    the next sales cycle, which was also set forth in the

2    declaration of Mr. Jason Bliss, I think that this self-serving

3    general statement that they may get more business in the next

4    business sales cycle without evidentiary proof, that also does

5    not show irreparable harm.

6          Further, the plaintiff's declaration also indicates that

7    we must have offered a lower price.  There is no evidence in the

8    record showing the price offered by either the plaintiff or the

9    defendant.  That argument, Your Honor, is also purely

10   speculation.

11         The plaintiff also argued that there is an adverse

12   impact in general to the patentee if there is a patent

13   infringement.  However, again, that is not specific information

14   that would apply to this particular case that justifies

15   irreparable harm.

16         Plaintiff also provided a self-serving statement in

17   their declaration saying that unless the Court issued a

18   preliminary injunction, they would lose substantial business or

19   they may just go out of business.  Again, Your Honor, this is

20   not evidence.  It's a self-serving general statement not

21   supported by any evidence.

22         Bed, Bath and Beyond is not a customer of the plaintiff

23   and plaintiff affirmed that, I think, very well without having

24   Bed, Bath and Beyond as a customer, so I don't understand why

25   the preliminary injunction -- without a preliminary injunction

1    the plaintiff will not be able to continue doing well without

2    Bed, Bath and Beyond as a customer.

3         Your Honor, I think that the general statement submitted

4    by the plaintiff without any supporting evidentiary proof is

5    irresponsible, is untrue, and it is a misrepresentation, given

6    the fact that they did very well, according to their own portion

7    of the story, without having Bed, Bath and Beyond as a customer.

8    Additionally, Your Honor, the plaintiff affirmed that in their

9    declaration they reported to the Court that the savings -- I

10   think they reported to the Court that the big retailer

11   customers, they would make a decision to decide what they would

12   purchase and from whom to purchase between March and May.  That

13   time has come and gone.  There is no need, Your Honor, for the

14   preliminary injunction.

15        And also, Your Honor, I think this is a very important

16   point, which is also my last point.  We filed a Motion for

17   Summary Judgment motion based on, first, lack of standing.  I

18   think it's clear that the plaintiff was merely a licensee when

19   this motion was filed -- I'm sorry, when the lawsuit was filed,

20   and the case law makes it very clear that the standing is

21   determined as of the date of filing.

22        And also, Your Honor, apparently the co-owner of the

23   patent was not joined in this lawsuit.  As such, in line with

24   the case law, the Court doesn't have subject matter jurisdiction

25   over this matter, and the case should be dismissed.  If the

```
 1    Court doesn't have jurisdiction, respectfully we think --

 2          THE COURT:  Why wasn't that motion filed sooner?  Why

 3    was it filed -- when was that filed?  Is that the one filed last

 4    night?

 5          MR. WANG:  Yes, Your Honor.

 6          THE COURT:  In the dark of the night after the case had

 7    been pending?  Why wasn't that filed six months ago?

 8          MR. WANG:  Your Honor, there were some concerns that we

 9    have discussed, and one of the concerns is that maybe it would

10    be beneficial for us to have a decision on the merits so that it

11    will create a res adjudicata effect.  But under the

12    circumstances, we think that it's the proper time to have the

13    motion.

14          THE COURT:  Yeah, right when we get down to the --

15          MR. WANG:  Respectfully, Your Honor, if the Court

16    doesn't have jurisdiction, it shouldn't grant any relief to the

17    plaintiff.  Thank you, Your Honor.

18          THE COURT:  All right.  Proceed with your evidence on

19    behalf of the plaintiff.

20          MR. HALL:  Thank you, Your Honor.  We want to start by

21    calling Mr. Jason Bliss, who is the vice president of our

22    client.  Mr. Bliss, if you would come on up here to this side

23    right here.

24          THE COURT:  Step around here by Mr. White.

25          MR. HALL:  Could I ask the court reporter for a couple
```

1  of exhibit stickers, is that possible?

2         THE COURT:  Stand behind that chair a minute.  The clerk

3  will swear him.

4         MR. HALL:  Thank you.

5         COURTROOM DEPUTY:  Sir, please raise your right hand.

6  (Witness sworn)

7         COURTROOM DEPUTY:  Please be seated.  State your full

8  name for the record.

9  **A.**     Jason McMillan Bliss.

10         MR. HALL:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12         MR. HALL:  Your Honor, one point of clarification.  I

13  know that we sort of devolved back into the summary judgment

14  argument.  I do actually have here some of the assignments of

15  the patent, and all that type of stuff, but I think it is easier

16  handled, unless the Court wants to take it up, I was going to

17  stick with my initial position on that.

18         THE COURT:  Yes, sir.  Please proceed.

19              **DIRECT EXAMINATION BY MR. HALL:**

20  **Q.**     Thank you.  Okay, Mr. Bliss, could you please tell us what

21  your position is with ATLeisure?

22  **A.**     Vice president.

23  **Q.**     And in that position, what are basically your functions,

24  sir?

25  **A.**     In charge of the day-to-day U.S. operation; sales,

1    managing customer service, the customer service team.

2    Q.    And how long have you been in your position as vice

3    president?

4    A.    Since the company formed.

5    Q.    And when was that?

6    A.    August, 2011.

7    Q.    All right.  And what I'd like to do, sir, is give us -- we

8    have talked a little bit about the sales cycle.  We heard a

9    little bit of argument about that, but, first of all, let me

10   just ask you this.  When the company was formed, when ATLeisure

11   was formed, what was your core product?

12   A.    Umbrellas, patio umbrellas.

13   Q.    And of those umbrellas, what type of umbrella was it that

14   you were selling the most of?

15   A.    Offset patio umbrellas.

16   Q.    And if you could for the Court, I think the Court is

17   probably familiar with this, but what is an offset umbrella?

18   A.    It's an umbrella that stands outside of a table.  It has a

19   supporting mast that the umbrella hangs from, and does not need

20   to be in the middle of the table.

21   Q.    And was it your position or was it the company's position

22   that that was to be its core product going forward?

23   A.    Yes.

24   Q.    And did you believe that your products that you were

25   selling were covered by and protected by the three patents that

1    are in suit in this case?

2    **A.**    On the offset umbrella, yes.

3         MR. WARD:  Objection, Your Honor.  Your Honor, leading.

4         THE COURT:  It will save us a lot of time.

5         MR. WARD:  All right.  I'll withdraw the objection.

6    **Q.**    Okay.  We have heard a little bit about the sales cycle

7    and a little bit has been argued and it's even been postulated

8    by the defense here that the sales cycle is over, and therefore

9    that an injunction would be no good.

10        Let me get you, if you would, to talk to the Court

11   briefly about the sales cycle, and the timing of sales, and then

12   I want to move you on to ask you what would happen if an

13   injunction ensued in this case now.  Okay.  So if you could,

14   please first tell us about that sales cycle.

15   **A.**    Sure.  It typically starts with a trend review as well as

16   initial designs.  It starts in the fall of the year prior, so

17   let's just call it October, September, October.  At that point

18   it then moves into initial meetings with the customer that take

19   place in January.  After that you start getting feedback from

20   the retailer as far as what items they have further interest in

21   to move forward with sampling, pricing and selection, initial

22   selections.  That typically takes place between the months of

23   March through June.

24   **Q.**    Okay.  And when are orders typically placed?

25   **A.**    We typically receive orders starting August 1st.  We'll

1    receive orders all the way through the end of September to allow

2    for the factories to have time to then manufacture the products,

3    since, again, as noted by the Court on numerous occasions, are

4    made in China, so it gives us time to prepare the product, to

5    ship it, and to have it in stores by December 26th, the day

6    after Christmas.

7    **Q.**    Okay.  And let's put this in a little context.  I'm

8    confident the Court got it, but just to make sure.  So if we are

9    talking about the March and June period of this year of 2013,

10   what is ongoing right now in that March --

11   **A.**    Decisions for 2014 business, placement of 2014 at those

12   retailers.

13   **Q.**    And then the actual product orders for this upcoming year

14   will come when, the upcoming year being 2014?

15   **A.**    It would start July, August, September, start receiving

16   orders.

17   **Q.**    And you heard the plaintiff -- or the defendants postulate

18   that, I guess, the horse is out of the barn and it is too late.

19   Is that correct?  If you got an injunction today, would your

20   company be able to go to its customers and make sales?

21        MR. WARD:  Objection.  Incompetent, state of mind of

22   another, pure speculation.

23        THE COURT:  Well, I'm letting you lead, but you are

24   getting into some pretty critical questions.

25        MR. HALL:  If I may, Your Honor, let me lay a little

```
 1   foundation.
 2          THE COURT:  Yeah, I think so.
 3   Q.    Okay.  How long have you been making these types of sales
 4   of umbrellas and outdoor products to these types of retailers?
 5   A.    Restate the question.
 6   Q.    How long have you, yourself, been involved in the sales
 7   process?
 8   A.    Since 2008.
 9   Q.    Okay.  And in that time, have you had -- have you had
10   experiences with larger retailers where at this point in time
11   going forward now you have managed to successfully solicit
12   customers and obtain orders from -- for the following year?
13   A.    Yes.
14   Q.    Okay.  And based upon your background and your experience
15   with customers, if these large retailers that want -- presumably
16   want the product that you are trying to sell, if they have been
17   looking at another vendor at this point in time, and that
18   vendor, for whatever reason, can no longer deliver, has it been
19   your experience that that creates a sales opportunity for your
20   company?
21   A.    Yes.
22   Q.    Okay.  Now, let me ask you a little bit about Bed, Bath
23   and Beyond just for a moment, and then I want to move to some
24   specific sales figures, if I may.
25          It was said that Bed, Bath and Beyond was not your
```

1   customer.  When you purchased -- when your company purchased the

2   intellectual property rights for these umbrellas, was it your

3   intention -- Well, when you first purchased them, did you have

4   any customers?

5   **A.**    Yes.

6   **Q.**    Okay.  Was it your intention to use those property rights

7   and go out and compete for new customers?

8   **A.**    Yes.

9   **Q.**    And did you believe at that time that if you were the

10   exclusive people allowed to sell your particular product, you

11   would have a better shot at competing for customers such as Bed,

12   Bath and Beyond?

13   **A.**    Yes.

14   **Q.**    And does the dynamic change for a customer such as Bed,

15   Bath and Beyond if there are other people pirating your

16   technology and selling similar products?

17   **A.**    Yes.

18   **Q.**    Okay.  And how does that change?

19   **A.**    You don't have an exclusive -- At that point you are

20   walking in with a me-too product, so why would the retailer even

21   consider anything other than price at that point?

22   **Q.**    So would it be fair -- Did you have an expectation that if

23   entities such as the defendant were not out competing against

24   you, that you would, in fact, land customers like Bed, Bath and

25   Beyond?

1    **A.**     Yes.

2           MR. HALL:  Okay.  Let me move a little bit -- let me

3    move a little bit now and let's talk about a little bit of sales

4    figures, if we could.  Your Honor, may I approach?

5           THE COURT:  Yes.

6    **Q.**     Let me approach you and hand you, if I could, plaintiff's

7    exhibit number 1.  Now, you have been handed plaintiff's exhibit

8    number 1.  Could you tell us what these documents are, sir?

9    **A.**     Yeah.  These are sales of ATLeisure's offset umbrellas

10   specifically, for years 2012 and now 2013.

11   **Q.**     Okay.  And in 2012, did you face competition from people

12   that you believed were -- for the 2012 sales cycle, let me be

13   careful on this, because I recognize that there is a lead for

14   the sales cycle.  For the 2012 sales cycle, did you face

15   developed competition from people that you believed were

16   improperly using your intellectual property?

17   **A.**     I'm not sure if I was aware of it at the time.

18   **Q.**     Okay.  And in 2012, what were ATLeisure's sales of the

19   umbrellas that fall within the scope of these patents?

20   **A.**     Based on this graph, it looks to be almost 7 million

21   dollars.

22   **Q.**     Okay.  And tell the Court what happened with that for the

23   2013 year, what has happened?

24   **A.**     Fell dramatically off to about 2 million dollars.

25   **Q.**     And would it be fair to say that given the sales cycle,

1    that you have made the sales that are going to be made for 2013?

2    **A.**    Correct, and shipped already.

3    **Q.**    All right.  All right.  Let's turn to the next page, if we

4    could, and I want to break this down to some specific customers

5    here.  What does the next page of exhibit number 1 depict?

6    **A.**    These are dollar sales by retailer from 2012 to 2013 by

7    retailer.

8    **Q.**    Okay.

9          MR. WANG:  Objection.  This is not evidence.

10         THE COURT:  This is not what?

11         MR. WANG:  Your Honor, I believe this is not evidence.

12   I think the witness just testified about what is in this

13   document.

14         MR. HALL:  Your Honor.

15         THE COURT:  I'll overrule your objection.

16         MR. HALL:  Thank you, Your Honor.

17   **Q.**    All right.  Now, what does -- in each -- have you broken

18   this down by customers that your company has on page 2?

19   **A.**    Correct.  These are customers we currently -- that we sold

20   in 2012, and as well as then it shows you that comparison in

21   2013.  Now, we do have additional customers, but this is

22   specific to offset umbrellas.

23   **Q.**    Okay.  Now, do you know if you have faced competition from

24   Evert as to each of your customers, or if they have only

25   selected some of your customers and gone after them, do you

1    know?

2    **A.**    Many of these customers, I would say, we have had specific

3    competition from ACE Evert, or Evertrust, Ningbo Evertrust.

4         THE COURT:  Wait a minute.  That is not specific enough.

5    I would say that we have had competition?

6    **Q.**    Okay.  Let me lay some foundation.  Thank you, Your Honor.

7    First of all, how do you have a chance to find out if you are

8    facing competition as the sales cycle progresses?  Do you know?

9    **A.**    In some cases, yes.  For retailer's review, and our

10   competitions are represented at the review.  So we would see

11   them at the review.

12   **Q.**    Okay.  Now, do you always find out, if you don't get a

13   customer, do you always find out who -- does the customer always

14   tell you who you have lost a sale to?

15   **A.**    No.

16   **Q.**    All right.  Can you go to the customers' stores, however,

17   and find out who you have lost the sales to?

18   **A.**    Yes.

19   **Q.**    How do you go about doing that?

20   **A.**    Once the product has been set, they set the display right

21   after Christmas, because Christmas is moving out and the area of

22   the store is now dedicated to lawn and garden, outdoor living.

23   At that point you can actually go into the stores.  They will

24   have the new product on the floor on display for the consumers

25   to purchase.  We then can actually identify by UPC code, because

1    a lot of these customers, Your Honor, actually sell under

2    private labels.  So a Home Depot, or a Lowe's, or a Wal-Mart may

3    not have the manufacturer's name listed, they will have their

4    private label, the brand that they are marketing under.

5         So at that point you have to go more specific to the UPC

6    code, which is obviously maintained by the federal government,

7    to identify who is manufacturing the product.  Or you can

8    actually go into the customer's system and ask an employee to

9    look up the vendor of record for that particular item, and that

10   would also let you know who is selling the product to the

11   retailer.

12   **Q.**    Okay.  Let's talk about two of the customers here that

13   have the most dramatic blue line and absence of orange, and,

14   first, let's lay our ground work.  The blue line, just to get

15   ahead and establish this is for your sales in 2012, is that

16   correct?

17   **A.**    We are still on the second slide.

18   **Q.**    Second slide, yes.

19   **A.**    The second slide represents in dollars, and we also have

20   it in units further back.  But, yes, in dollars.

21   **Q.**    All right.  And then the orange is 2013, correct?

22   **A.**    Yes, sir.

23   **Q.**    And if there is no orange line at all, what does that

24   indicate?

25   **A.**    Zero sales to that retailer in offset umbrellas.

1    **Q.**    All right.  Let's look at Lowe's.  Was Lowe's your biggest

2    customer for 2012, or is it just the biggest one depicted on

3    this particular page?

4    **A.**    It was the largest customer by offset umbrellas.

5    **Q.**    All right.  And the total volume, am I correct, is about

6    2.5 million?

7    **A.**    Yes, sir.

8    **Q.**    And you have had no sales to Lowe's this year?

9    **A.**    Correct.

10    **Q.**    All right.  Let's look at Wal-Mart, which looks to be

11    about the second or may be tied with QVC.  Same thing, you had a

12    lot of sales in 2012, none in 2013?

13    **A.**    In offset umbrellas, correct.

14    **Q.**    Have you gone to Wal-Mart and done any investigation to

15    determine who got the offset umbrella market?

16    **A.**    Yes.

17    **Q.**    Okay.  And tell us about that, what happened?

18    **A.**    Identified that they had a very similar product to what

19    was being sold at Bed, Bath and Beyond, except without solar

20    lights.  It was an offset umbrella.  They actually have two

21    offset umbrellas under the Main Stay private label.  At that

22    point I took photographs at the store level and determined that

23    it looked to be being made by Ningbo Everluck, also the parent

24    company of ACE Evert, and the way I know this is because on the

25    canopy is a sewn-in label that actually says Evert.  Also, I

1   researched the UPC code to find out that Ningbo Evertrust, the

2   parent company of ACE Evert, was the one selling these umbrellas

3   to Wal-Mart.

4           MR. HALL:  May I approach the witness, Your Honor?

5           THE COURT:  Yes.

6   Q.    Let me give you a copy of plaintiff's exhibit number 2,

7   sir.  Okay.  You described the picture that you took of what you

8   saw at the Wal-Mart store -- the umbrella that came from

9   Wal-Mart.  Is this -- the first page of plaintiff's exhibit

10  number 2, is this an accurate reflection of that umbrella?

11  A.    This was a picture I personally took in Los Angeles,

12  California at a local Wal-Mart store, yes.

13  Q.    Now, you heard earlier the plaintiff -- the defense

14  testify -- argue that there were no other sales to any other --

15  to any other customers other than Bed, Bath and Beyond.  Is it

16  your belief based upon your investigation that they have, in

17  fact, been making sales to other customers beyond Bed, Bath and

18  Beyond?

19  A.    Yes.

20  Q.    Now, I'd like to turn you just quickly -- I don't want to

21  belabor this point too much, but I'd like to turn you to the

22  third page of exhibit number 1, and just point out the number of

23  units overall depreciation in sales.  And I don't want you to

24  have to do the math.  But is this -- does this accurately

25  reflect what has happened to your sales of offset umbrellas,

1   that they have gone from 58,026 in 2012 overall to 19,536?

2   A.    Yes, sir.

3   Q.    Now, in your research of the market, has the market -- the

4   overall market, has the overall size of the market for offset

5   umbrellas decreased such that this would be due to just simply a

6   decrease in the overall market?

7   A.    No.

8   Q.    Okay.  Now, let me get you, if you would, just to turn to

9   the last page of the exhibit.  And it looks like, am I correct,

10  that what is reflected in the last page of the exhibit are sales

11  to the various companies in number of units and numbers of

12  dollars?

13  A.    Sold to the purchase price, yes, what the price we sold it

14  to that retailer for, correct, times the number of units sold.

15  Q.    Have you done any investigation into Lowe's as a customer

16  and who is selling them the offset umbrellas?

17  A.    Yes.

18  Q.    Okay.  And what is the result of that investigation?

19  A.    I think Mr. Brown can testify, because he was with me at

20  this, but I believe it was Yotrio that was the competitor

21  identified.  I apologize.  I get confused between Yotrio and

22  Activa, but it was one of those two that was identified to be

23  manufacturing.  We have confirmed that with a store employee.

24  Q.    Now, in your affidavit that was submitted, did you express

25  concern that once one -- that once one copycat, one pirating

1    producer is out there, others will copy?

2    **A.**   I did.

3    **Q.**   And in your experience in this business and as a salesman

4    for over the last amount of years that you have been one, have

5    you seen that happen in various market places where when one

6    person comes in and violates the patent rights, others flood

7    into the market?

8    **A.**   I have experienced it only in patents with these offset

9    umbrellas.  I can only speak to that, and yes.

10   **Q.**   All right.  Now, is it the company's intention as it

11   stands right now after this -- at whatever time when it moves

12   forward, to enforce its patent rights against other illegal

13   competitors?

14   **A.**   Yes.

15        MR. HALL:  Your Honor, I will rest with this witness and

16   turn him over to the other side.  I would like -- I have one

17   more that I'd like to call that I think will be more brief.

18        THE COURT:  Okay.  Cross examination.

19                 **CROSS EXAMINATION BY MR. WARD:**

20        MR. WARD:  Yes, please the Court, Your Honor.

21   **Q.**   Mr. Bliss, have you ever been to China?

22   **A.**   Yes.

23   **Q.**   How long does it take to get from -- to get reservations

24   when you are in China to come back to the United States?

25   **A.**   I don't understand your question.

1    **Q.**    If you are in China and you want to come back to the

2    United States, you have to get reservations, right, to come

3    back?

4    **A.**    If you buy a plane ticket, are you referring to?

5    **Q.**    Right.  And so how long does it take you to get back?

6    **A.**    I still --

7    **Q.**    From China.

8    **A.**    You asked me how long it takes to make a reservation and

9    how long it takes to get back.  What's the question?

10   **Q.**    Yes.  How long does it take you to get back from China?

11   **A.**    On an airplane?

12   **Q.**    Yeah.

13   **A.**    It takes me about 14 hours.

14   **Q.**    14 hours.  Okay.

15            THE COURT:  Fast plane.

16   **Q.**    Isn't it correct that you don't know what decisions Bed,

17   Bath and Beyond has made for the 2014 season?

18   **A.**    I do not know that the retailers' decision has been made.

19   **Q.**    You have related some various conversations you had with

20   retailers, right, in your testimony?  Is that correct?

21   **A.**    What's the question?  I'm not sure if I understand.

22   What's the question?

23   **Q.**    My question is have you in your testimony today related

24   conversations that you had with various retailers?

25   **A.**    What kind of conversations are you talking about?

1   **Q.**    Any conversation.

2   **A.**    Yeah, I have presented product to retailers.

3   **Q.**    Who did you talk to?

4   **A.**    Personally who I have spoken to?

5   **Q.**    Yeah, their names.

6   **A.**    Target.

7   **Q.**    The name of the person, sir.

8   **A.**    At Target?

9   **Q.**    The name of the declarant, sir.

10          MR. HALL:  Your Honor.

11          MR. WARD:  The person.

12  **A.**    Alona Humphrey is our buyer.  Lindsey Crouse.  You want to

13  keep going?

14  **Q.**    Yes.  Name them all.

15  **A.**    All right.  Lindsey Crouse, Alona Humphrey.  Let's see,

16  who else have I spoken to?  I can go back and give you an exact

17  list of people's names.

18  **Q.**    Are any of them here in court to testify today so that I

19  can cross examine them as to the contents of this alleged

20  conversation?

21  **A.**    No.

22          MR. WARD:  Okay.  Motion to strike.  Hearsay, Your

23  Honor.

24          THE COURT:  Overruled.

25  **Q.**    Mr. Bliss, in your declaration that you filed with the

1   Court, paragraph 5, I'm just going to read this.  It says:

2   Generally speaking, large retailers make a final decision on

3   what will be purchased and place orders for the following year

4   between March and May.  Is that an accurate estimate or is that

5   a statement you want to go back on now?

6   **A.**    That's my personal opinion on how that sales cycle

7   happens.

8   **Q.**    Okay.  Well, it's May now, right?

9   **A.**    Yeah.

10   **Q.**    So if this statement is accurate, the final decision has

11   already been made.

12   **A.**    We have got nine days left.

13   **Q.**    Okay.  You proposed a graph.  Where did you get this data

14   for this graph?

15   **A.**    That's from our computer system, our sales.  That's how we

16   track all of our purchase orders, sales, everything that we do.

17   **Q.**    You didn't put this together yourself, did you?

18   **A.**    My accountant put that together, yes.

19   **Q.**    And you have provided a sheet with some numbers on it.

20   Isn't that right?

21   **A.**    Yes, sir.

22   **Q.**    And where did you get these numbers?

23   **A.**    The same source.

24   **Q.**    Okay.  You didn't bring those original documents, did you?

25   **A.**    I can get those for you.  Rick Behr, who also went under

1    testimony for your -- I guess he had a deposition by your --

2    **Q.**    You can get them, right, but I don't have them now, right?

3    **A.**    Correct.

4    **Q.**    And as far as you know, nobody made any effort when this

5    hearing was called down on Monday to produce anything like this

6    that you would be presenting to the Court, right?

7    **A.**    You'd have to ask my attorneys, I don't know.

8    **Q.**    Okay.  All right.  This is something that was

9    especially -- this document that has numbers on it, it's not

10   numbered, but doesn't have an exhibit number, is this something

11   that you made up especially for this trial today?

12   **A.**    No, we run customer reports like this weekly.

13   **Q.**    I'm talking about this one, this sheet.

14   **A.**    Yeah, that's the numbers that we built the graphs off of,

15   correct.

16   **Q.**    This is not a piece of paper that you keep and use in your

17   business, right?  This is for court, right?

18   **A.**    This specific piece of paper is for court, yes.

19   **Q.**    Okay.  With regard to, say, Wal-Mart, for example, here.

20   **A.**    Which page are you on?

21   **Q.**    This blue line that's on this piece of paper.

22   **A.**    Is that the units or the dollars?  Which one are you

23   looking at?

24   **Q.**    Either one.

25   **A.**    Okay.

1   **Q.**    Either one.  They are both blue lines.

2   **A.**    Sure.  The units is a lot more dramatic, isn't it?

3   **Q.**    Well, let me just ask you about how dramatic it is.  How

4   is it that you have confidence, if the Court were to grant a

5   preliminary injunction in this case, that that's business that

6   you would get instead of, I don't know, any one of the other

7   twelve or fifteen other competitors that you have said offer

8   lower prices than you do?

9   **A.**    We had the business to begin with.

10          MR. HALL:  Let me object to the form of the question as

11  being improper.  There's been no such testimony like that from

12  him.  Nobody has said or established that there are all these

13  other competitors out there selling the same thing.  And

14  certainly nobody said thirteen other than the plaintiff -- than

15  the defense, so I think the question is improper.

16  **Q.**    Do you have any -- Are there any competitors out there who

17  sell offset umbrellas?

18  **A.**    Yes.

19  **Q.**    How many are there?

20  **A.**    Four, five.

21  **Q.**    Okay.  I'll venture to say four or five.  How do you know

22  those four or five aren't going to get this business instead of

23  you getting it?

24  **A.**    That's not my decision to make.  It's the buyer's decision

25  at Wal-Mart.

1    **Q.**    Okay.  Counsel gave us some pictures here, some

2    photographs.  Can you tell us what these are?  What is this

3    first page?

4    **A.**    Sure.  The first page you are looking at is an up-close

5    picture of a rib.  There are ribs that hold the canopy to the

6    umbrella, and the yellowish color in the background is the

7    canopy, and then the white Main Stay label with the Evert

8    stamped on it is an ID tag that the government requires you to

9    identify who is shipping the product into the United States from

10    China.

11         So this is just basically telling you what the material

12    is made of.  The price, it says a hundred percent polyester.

13    It's going to have the address of Main Stays, which is Wal-Mart,

14    Bentonville, Arkansas, then it's got 1241, which identifies,

15    again, most likely a production number.

16    **Q.**    You produce your umbrellas in China, right?

17    **A.**    We do.

18    **Q.**    And those umbrellas come into the United States to

19    retailers, right?  Is that correct?

20    **A.**    Yes.

21    **Q.**    Are those shipped FOB China?

22    **A.**    Some are, and some are actually prepaid.

23    **Q.**    Okay.  The ones that are shipped FOB China, do you happen

24    to know where title passes?

25    **A.**    Not -- I don't want to assume.  I can guess, but I'm not

1  going to guess.

2  **Q.**    Is it your -- Is it within the realm of your knowledge

3  that when you ship something FOB China that title passes to the

4  customer, say it's Wal-Mart?  If it's going to Wal-Mart and it

5  is FOB China, title passes right then and there in China to

6  Wal-Mart, isn't that right?

7         MR. HALL:  Your Honor, I think we are calling for

8  speculation.  I think counsel wants to testify instead.  So I

9  object.  The question is calling for speculation.  He's already

10  told counsel he doesn't know.

11        MR. WARD:  I don't know whether he said that or not.  I

12  asked him if that is within the range of his knowledge.  He

13  could say it isn't.

14        THE COURT:  I think he's made it clear it is not.

15  **Q.**    Okay.  Do you have any knowledge, sir, as to -- you said

16  that somebody identified the Everluck Company.  Who was that

17  again?

18  **A.**    Myself.

19  **Q.**    Which customer identified Everluck?  I didn't quite

20  understand.

21  **A.**    No, no.  What I said was when I took these photographs, I

22  also took pictures of the UPC code.  At that point I looked up

23  the UPC code and determined that it was actually -- I can

24  provide evidence of that later, if you need.  I can bring my

25  phone in.  Of the fact that it's being manufactured by Ningbo

1    Everluck, the parent company of ACE Evert.

2    **Q.**    Okay.  Now, Everluck is not a party to this lawsuit, are

3    they?

4    **A.**    They are the parent company of ACE Evert.

5    **Q.**    Are they a party to this lawsuit?  Do you know?

6    **A.**    Look at the documents.  I don't know.

7    **Q.**    All right.  Do you know whether or not the seller of these

8    accused products in this case is Everluck or ACE Evert?

9    **A.**    I can just tell you what I know from the UPC code, which

10   is what I stated in court already.  Ningbo Everluck is the

11   parent company of ACE Evert.  That's what I know.

12   **Q.**    Are you aware, sir, that under section 271(a) of the

13   Patent Act, the acts that may be accused of patent infringement

14   are making, using, selling, offering for sale, and importing

15   into the United States?

16   **A.**    Do not.

17   **Q.**    Okay.  Do you know as to these accused units that you are

18   talking about at Bed, Bath and Beyond, do you know whether ACE

19   Evert, a party to this lawsuit, sold those, or do you know

20   whether it was Everluck that sold them, not a party to this

21   lawsuit?

22   **A.**    I believe that was identified in the documents my

23   attorneys have produced to you, again, referencing again the UPC

24   code, which ties back to the manufacturer of record.

25   **Q.**    And is it your understanding that it was Everluck, not a

1    party to this lawsuit, that sold the units accused of patent

2    infringement in this case?

3    **A.**    I do not know the answer to that.

4    **Q.**    Just so we are sure on this, do you know whether the units

5    were shipped FOB China such that the sale would have been made

6    in China?

7          MR. HALL:  Objection to the form of the question, same

8    objection.

9          THE COURT:  Sustained.

10   **Q.**    Are you aware, sir, that a sale of an item that is made --

11   that's where the sale is made in China cannot be accused of

12   patent infringement in the United States?

13   **A.**    I'm not a lawyer.  You tell me.

14   **Q.**    At the appropriate time, we will.  Now, just so we are

15   clear on this, as to these conversations that you have testified

16   you had with retailers, did they give you any documents?

17   **A.**    Ask the question one more time.

18   **Q.**    Did they give you any documents that would validate or

19   correspond to their reports to you that they were supposedly

20   buying product from my client, ACE Evert, or was this just an

21   oral statement?

22   **A.**    They have not given us a document, no.

23   **Q.**    Have you ever had any experience, sir, in predicting the

24   future?

25   **A.**    No.

1          MR. WARD:  Thank you.  That's all, Your Honor.

2          MR. HALL:  Your Honor, just, I think, one very quick

3    question in rebuttal.

4                **REDIRECT EXAMINATION BY MR. HALL:**

5    Q.    You were asked, sir, to take a look at that last page of

6    the number -- of exhibit number 1 with the figures.  And then

7    you were asked, I think, is this a record for court or a typical

8    record that your company keeps.

9          Let me just ask you the question this way:  Is this, the

10   last page of exhibit number 1 with the sales figures, a typical

11   record that your company keeps in the ordinary course of its

12   business?

13   A.    Yes, I said weekly we do this.

14         MR. WARD:  Objection.

15         MR. HALL:  Thank you.

16                **RECROSS EXAMINATION BY MR. WARD:**

17   Q.    So we are clear on this, isn't your testimony that this

18   piece of paper is something that was made up for trial and not

19   something that you use in your business?

20   A.    This specific document, this specific document here?

21   Q.    This piece of paper that is being presented here as

22   evidence, yes.

23   A.    This was specifically put with the graphs.

24   Q.    And I suppose it is correct then that prior to bringing

25   this in you got out the original documents yourself and you

1    verified that these numbers are the numbers?

2    **A.**    These numbers are accurate for our offset sales for 2012.

3    **Q.**    They are accurate because you did this or --

4    **A.**    No, it's accurate because I have visibility weekly to what

5    our sales are for all our categories, including offset umbrellas

6    and marketing umbrellas, I have access to this information

7    weekly.

8    **Q.**    But you didn't make up this document?

9    **A.**    I did not make up the document.

10              MR. WARD:  All right.

11              MR. HALL:  Your Honor, I would move to admit the

12   exhibits that we have put in, that is, exhibits number 1 and 2.

13              THE COURT:  1 has how many pages?

14              MR. HALL:  Your Honor, 1 has five pages, and exhibit 2

15   has four pages.

16              MR. WARD:  Objection to foundation, Your Honor.

17              THE COURT:  Overruled.  They will be admitted.

18              MR. HALL:  Then I would ask if the witness may step back

19   down.

20              THE COURT:  Let me ask him a question, because I think I

21   missed this.  The graph that shows the Lowe's, the blue line for

22   Lowe's, and then, of course, there is no brown line or red line

23   for 2013 for Lowe's, and I believe -- I'm not sure I understood

24   his testimony.  He investigated if Lowe's was using another

25   manufacturer for umbrellas.  And what was it that you found out

1    about Lowe's in 2013?

2    A.    For Lowe's specifically, sir?

3         THE COURT:  Yeah.

4    A.    We believe it is either being manufactured by, like I

5    said, Mr. Brown can maybe testify to this.  It was either Yotrio

6    or Activa are the two names that I am remembering.  I can't

7    remember the exact one.

8         THE COURT:  That's not the defendants in this case, is

9    it?

10   A.    No, sir.

11        THE COURT:  Activa?  So Lowe's has bought from somebody

12   that is not involved in this case.

13   A.    Yes, sir.

14        THE COURT:  Okay.  All right.  That's all I have for

15   him.

16        MR. HALL:  Thank you, Your Honor.

17   A.    I can step down?

18        THE COURT:  Yes.

19        MR. HALL:  May I ask one more question of this witness,

20   Your Honor?

21        THE COURT:  Okay.

22   Q.    Sir, in looking at the Lowe's umbrella, do you believe it

23   also infringes on the patent?

24   A.    Yes, I do.

25   Q.    And is it the company's intention to pursue action against

1    that infringing or believed infringing party as well?

2    **A.**    Yes.

3    **Q.**    And is it -- Does the company believe that if it pursues

4    this litigation and then goes and pursues whether through

5    letters or other actions enforcement of its patent rights

6    against the other infringers, that it will regain its market

7    share?

8    **A.**    Yes.

9          THE COURT:  That's a very good argument to the Court and

10   the jury.  It's not much of a question for the witness.

11         MR. WARD:  If I may, Your Honor, just on that last

12   point.

13         THE COURT:  Okay.

14              **FURTHER RECROSS EXAMINATION BY MR. WARD:**

15   **Q.**    Are you -- It's correct that you bought these patents from

16   a company named Southern Patio, correct?

17   **A.**    Southern Sales Marketing Group, yes.

18   **Q.**    Also known as Southern Patio formerly here in Atlanta?

19   **A.**    Yes.

20   **Q.**    Isn't it true that Southern Patio had occasion to enforce

21   these patents prior to the time that you bought them?

22   **A.**    I'm not aware of that.

23   **Q.**    Isn't it true, sir, that Southern Patio filed suit against

24   Yotrio on these patents?

25   **A.**    I'm not aware of that.

1    **Q.**    Isn't it a fact that they settled their case with Yotrio

2    such that Yotrio may not be sued again on these patents?

3    **A.**    I do not know.

4    **Q.**    So isn't it a fact that if these sales at Lowe's were made

5    by Yotrio, you would have no occasion to sue them, because they

6    are a licensee now.  Isn't that a fact?

7                MR. HALL:  Your Honor --

8    **A.**    They are not a licensee.  We don't have them as a

9    licensee, so --

10   **Q.**    Well, you don't have them as a licensee.  Do you know

11   whether or not Southern Patio licensed them pursuant to a

12   settlement agreement?

13               MR. HALL:  Your Honor, may I object?  First of all, he

14   is asking for speculation.

15               THE COURT:  No, I don't think he is asking for

16   speculation.  He is asking for a fact.

17               MR. HALL:  Well, he is asking it afterwards --

18               THE COURT:  It may be speculation on your witness's

19   part.  He may not know, but if he doesn't know, he can say I

20   don't know.

21   **Q.**    Do you know, sir?

22   **A.**    I do not.

23   **Q.**    Did you have occasion to make any study of prior

24   enforcement of these patents and the settlement agreements that

25   have been made pursuant thereto prior to the time that your

1   company bought them?

2   **A.**    No.

3   **Q.**    Do you know whether or not your company, having bought

4   these patents, is bound by prior settlements on these patents by

5   the prior owner?

6   **A.**    I do not know.

7          MR. WARD:  Okay.  Nothing further, Your Honor.

8          THE COURT:  Anything further for this witness?

9          MR. HALL:  No, sir, Your Honor.

10         THE COURT:  He can step down.  Call your next witness.

11         MR. HALL:  Thank you.  Your Honor, we would call Bill

12  Browne.

13  **A.**    You want me to leave this up here?

14         MR. HALL:  Please leave those up here.

15  **A.**    Sorry about that.

16  (Witness sworn)

17         COURTROOM DEPUTY:  Please be seated.  State your full

18  name for the record.

19  **A.**    William Martin Browne, with an e, B-r-o-w-n-e.  I paid

20  extra for that e, so.

21                **DIRECT EXAMINATION BY MR. HALL:**

22  **Q.**    Good afternoon, Mr. Browne.  I want to get sort of right

23  to the quick, but let's just acquaint you with the Court and the

24  Court with you.  What is your position in ATLeisure?

25  **A.**    I'm president of the company.

1  **Q.**    And in that position, what are your essential functions?

2  **A.**    Run all the U.S. operations, and I run the whole company.

3  I run all facets of the company.

4  **Q.**    And do you, either formally or informally, sir, engage in

5  forecasting based upon market events and market trending that

6  you are seeing?

7  **A.**    Yes.

8  **Q.**    Have you been watching the sales as -- sales that have

9  been depicted here, have you been watching this trend as it's

10  been going along?

11  **A.**    Yes.

12  **Q.**    Would it be fair to say you watch it regularly?

13  **A.**    Weekly, as Mr. Bliss stated.

14  **Q.**    Okay.  Could you tell me based upon the events since you

15  discovered the products of ACE Evert that we believe to be

16  infringing, can you tell me what has happened to your offset

17  umbrella market in the particular offset umbrellas that are

18  covered under these patents?

19  **A.**    It has deteriorated exponentially, as everyone can see by

20  the numbers.  The reason that we even went, or even went down

21  this road and are sitting in this room was because of our fear

22  of this exact thing happening.  I have been in the business many

23  years, and the minute one gets on the market, it then becomes

24  another, and another, and it becomes harder and harder for us to

25  explain to our customer base that, you know, this is a patented

1   specific product to our company.  And that has just eroded this

2   immensely in the last two years, as you can see.

3   **Q.**    Now, at the time you started the business, sir, did you

4   have an option as to whether or not you would make an investment

5   and buy patented technology, or just go out and start producing

6   umbrellas that didn't fall under any patent?

7   **A.**    Absolutely.

8   **Q.**    Tell us why it is -- First of all, tell us what the

9   investment was.  How much did it cost?

10  **A.**    Roughly 5 million dollars.  I believe 5 million.  I don't

11  know the exact number off the top of my head.  5 million

12  dollars, and that was made specifically not only to maintaining

13  growth in that category, but come to the market with the

14  assumption that we are a technology company, not just an

15  umbrella company.  A lot of people, as the defendant has said,

16  there is a lot of umbrella companies out there.  That is not the

17  perception we wanted in the market.

18  **Q.**    And what do you see as the advantage of marketing yourself

19  that way, as a technology company?

20  **A.**    Through that innovation, of course, you can -- it's more

21  profitable, and also creates more opportunity for mass selling,

22  more channels of distribution, I should say.  It's much more

23  intriguing when there is solar lights, or there is an offset

24  cantilever, or there is -- these things make us valuable to our

25  customer.

1    **Q.**    And when you call yourself a technology company, just what

2    does that mean?

3    **A.**    It means we are constantly -- we have a development team

4    and a design and development team that does nothing but work on

5    new innovation, and they are in the process of patenting more

6    innovation every day.  So that means do we change the light from

7    cool light to warm light?  How do we do that?  How can we get

8    that done, because that is something we feel the customer will

9    really like, and it takes time, energy and money to do that, as

10    we all know.

11    **Q.**    And how do these patents that you acquired play into that

12    philosophy?

13    **A.**    They are the cornerstone of the whole philosophy.  That

14    was really the start to get us down the road and give us the

15    actual -- the sales and horsepower to continue to grow, which

16    has gone away.

17    **Q.**    Now, how did you find that ownership of the patents -- how

18    did you go about marketing that?

19    **A.**    Every customer that we call on, Mr. Bliss and our sales

20    team calls on, would talk to those customers about the fact what

21    is patented, what is not, and make it very clear this is a

22    specific product to us.

23    **Q.**    Okay.  And initially how did that affect your sales?

24    **A.**    It was very successful.  We maintained and grew market

25    share very quickly the first year.

1   **Q.**    Okay.  Now, if trends continue, and I won't bother to ask

2   you if you can predict the future or not, but let me ask you

3   this.  If the trends continue as they are now in the offset

4   market umbrella, the market for umbrellas that are covered by

5   your patents, what do you anticipate will happen?

6   **A.**    We will go out of business.  We have lost multiple

7   millions of dollars this last year.  Due to these losses, I had

8   to lay off multiple people, and without our investors, we

9   wouldn't be sitting here right now.  It already would be over.

10  You can tell by looking at this page, from 7 to 2, you can't

11  survive.

12  **Q.**    Now, we have heard testimony about what makes you think

13  that -- or argument about what makes you think that if ACE Evert

14  weren't competing you would manage to recapture your market.

15  **A.**    I would answer a little differently than Jason did.  We

16  were in every major retail review this year with our offset

17  cantilever products, and we were finalized, meaning the short

18  list, what they call short list.  They will have all the ten

19  vendors he is talking about, which Jason said five, they will

20  then shorten this down to two, and then they will make their

21  final decision, and usually that is driven by, of course, price.

22  And then not only price, but what are the features and benefits

23  of this product.  So now these copycats are on the market with

24  this product, now you narrow it down.  These guys have the same

25  thing, then it becomes a price issue versus I have something

1    that you cannot -- you can't be the same, because I own the

2    patents on that product.  That's really what's happening.

3            And so for me to make a phone call next week and say,

4    you can no longer have that.  If you've made that decision, we

5    don't know yet because they don't tell us, and as Jason said,

6    there are nine days left, I can make a phone call next week and

7    say, you are no longer allowed to have that.  Of course, the

8    buyer will say, okay, I need to reopen this thing.  I need to

9    think about what I'm doing.  Absolutely we can get business

10   back.  So this is -- there is a lot more to this than their

11   decision is made, bam, it's done.  That's not the way it works.

12   Q.    If the -- if you are successful -- well, regardless of

13   whether you are successful today, is it your intention to go out

14   and pursue enforcement of your patent rights against all other

15   infringers that you can find?

16   A.    Absolutely, yes.

17   Q.    Now, is it fair to say -- I think we talked about this

18   before, but am I correct that you can't find an infringer -- is

19   there any way to go out there and find an infringer with

20   certainty before they get their products into the customer?

21   A.    No.

22   Q.    And when do the products typically arrive, or when do they

23   get on to customers' shelves so that you can go and look for

24   them?

25   A.    As Mr. Bliss said, you have to go down to Florida.  It's

1   regional.  So in the south, Florida all the way up to Georgia,

2   it is usually January, right first of the year.  And then as you

3   go north, February, March, into March before it actually hits

4   the shelves.  So that's why when you see that image that we got

5   in January at Lowe's was in Florida, because, of course, as soon

6   as the market is set, as a company that's what we do.  We go out

7   and look at that market and understand what is going on.  So

8   that's where we found that information.  That's why it happened

9   in that time frame.  January is the time, if that answers you.

10          MR. HALL:  Okay.  I believe that's all.  I would turn

11  the witness over, Your Honor.

12                  **CROSS EXAMINATION BY MR. WARD:**

13  **Q.**    Mr. Browne, what infringers have you identified other than

14  the allegations made against the defendant, ACE, in this case?

15  **A.**    Yotrio, as Mr. Bliss stated.  A company called Red Star as

16  well.  And Activa, Activa.

17  **Q.**    Well, I was counsel for Red Star in the case that you all

18  filed, and we settled that case.  Are you going to sue my client

19  again?

20  **A.**    No, sir.  No, sir.

21  **Q.**    Well, I was counsel for Yotrio in the case that Southern

22  filed.  Are you going to sue my client, Yotrio, again?

23  **A.**    I don't know, sir.  I don't know anything about that

24  filing.  That was before my time.

25          MR. WARD:  Your Honor, we'll make that settlement

1    agreement available to the Court.  It seems to be material to

2    this big blue line they are talking so much about.

3    **Q.**    You say you lost business due to alleged infringers.  You

4    are familiar with reports that -- you have dealt with QVC,

5    haven't you?

6    **A.**    Yes, sir.

7    **Q.**    And, in fact, you've sold your umbrella products to QVC,

8    right?

9    **A.**    Yeah.

10   **Q.**    You are familiar that on the QVC website they have a

11   section there that provides for comments from purchasers, right?

12   **A.**    Yes.

13   **Q.**    Were you aware of a comment that was made by a QVC

14   customer that was entitled, "Never Again"?  "Thank you to QVC

15   service for providing me with the assistance to resolve my total

16   dissatisfaction with this product."  Are you familiar with that

17   comment?

18          MR. HALL:  Your Honor, may I object to the relevance of

19   the question in this respect.  The patent right is a right to

20   exclude others from the market.  If one customer is somewhere

21   dissatisfied, which I assume he is driving at, which is clearly

22   hearsay to get there anyways, we don't have any basis for it, it

23   has no relevance to this proceeding.

24          THE COURT:  I'm sort of lost.  What is the relevance of

25   your question?

1         MR. WARD:  They said their damages sprang from patent

2    infringement, alleged patent infringement.  It seems very

3    evident from these comments that the reason why they are going

4    out of business, and, I guess, asking for sympathy or something

5    from the Court, is because people don't like their product, and

6    I have got a whole --

7    A.    Before you go any further --

8         MR. WARD:  I have a whole handful here of things I'd

9    like to ask this gentleman, if he knows about it.

10        THE COURT:  A handful isn't going to get it.  I'm not

11   going to sit here and listen to a bunch of anecdotal evidence of

12   some complaints about a product of what they have sold millions

13   of now.  I mean, you can have a thousand complaints.

14        MR. WARD:  I know that, Your Honor.

15        THE COURT:  Move on then.  If you know that, don't waste

16   my time.

17        MR. WARD:  All right.  I know it now, now that you have

18   helped me.

19   Q.    Sir, can you isolate the cause of your financial problems

20   purely to patent matters and separate that from the quality

21   issues that you have had with your product?

22   A.    Restate the question.  I'm sorry.  I'm trying to

23   understand what you are asking me.

24   Q.    I say, can you isolate the cause of your financial

25   problems and attribute that to your patent problems?

1  **A.**   I can isolate the patent, the offset umbrella patent

2  issues, the things I feel I have lost is on these documents.

3  That how I have isolated it.  I have other parts of my business

4  absolutely that might not be, but I think the driving force of

5  this is the patent infringement.  That's all I know.  I don't

6  know if that answers your question or not, that's what you are

7  asking.

8  **Q.**   And your testimony has been you are going to go out of

9  business because of patent infringement and nothing else, no

10  other reasons?

11  **A.**   I can't predict the future.

12  **Q.**   Okay.  And one of those patent infringements that you have

13  alleged is Lowe's, and the seller there is Yotrio, right?

14  **A.**   Right.

15         MR. WARD:  Okay.  That's all I have, Your Honor.

16         MR. HALL:  That's all I have for this witness, Your

17  Honor.

18         THE COURT:  All right.  He can step down.  Any further

19  evidence on behalf of the plaintiff?

20         MR. HALL:  We are prepared to close our evidence, Your

21  Honor.

22         THE COURT:  All right.  I assume that means no.

23         MR. BRAZIER:  Your Honor, we have no further evidence.

24         MR. WARD:  Your Honor, I'm reluctant to close our

25  evidence.  I know the Court has indicated that we should have

1    had a witness here.  Our witnesses, unfortunately, are in China.

2    We got the word on Monday in the afternoon this hearing was

3    going to come down.  We did not have the opportunity to present

4    witnesses from China within that short notice.  So if the Court

5    entertains the motion, we would ask --

6            THE COURT:  Tell me --

7            MR. WARD:  We would ask for a continuance.

8            THE COURT:  Feel free to interrupt me.  Make a proffer

9    of what this witness is going to say, please, sir.  You may have

10   had short notice as to this particular hearing.  You've had a

11   good bit of notice that this was going to be a question sooner

12   or later for the Court.  You could have taken a deposition, or,

13   at least, some kind of declaration or affidavit.  So make some

14   proffer of what this witness is going to tell me.  You really

15   plan to produce him, are you going to do a deposition later?

16   What is it you want to do?

17           MR. WARD:  He would rebut the testimony of these

18   gentleman as to -- that they have given today.  That is at

19   variance with what they said previously.

20           THE COURT:  In what particular way?  I mean, there is a

21   lot of testimony here.

22           MR. WARD:  Their testimony about --

23           COURTROOM DEPUTY:  Mr. Ward.

24           MR. WARD:  Their testimony about what they have said is

25   in the minds of retailers, and what the marketplace supposedly

1    dictates, and how things are done, and why it is specifically

2    that they wouldn't have gotten this business anyway.

3            THE COURT:  Could you name this person in China for me?

4            MR. WARD:  I can't.  My counsel may be able to do it.

5            THE COURT:  Spell it.

6            MR. WANG:  Your Honor, I think that we have probably two

7    witnesses that we want to present.  One is Nick Wang, also known

8    as Zhaojun Wang.

9            THE COURT:  Spell it.

10           MR. WANG:  Z-h-a-o-j-u-n.  That's the first name.  Last

11   name, W-a-n-g.  He's the one who submitted the declaration in

12   opposition to the plaintiff's preliminary injunction motion.

13   And also we plan to present our chief engineer in China to

14   provide his analysis as to the non infringement.

15           MR. HALL:  Your Honor, may I respond to this?

16           THE COURT:  Sure.

17           MR. HALL:  What we heard a moment ago at the beginning

18   was this motion is old and stale.  There is nothing that has

19   been said here that was not in an affidavit that hasn't been in

20   front of these gentlemen for -- as old and stale as they say

21   that it is.  Number one.

22           Number two, we were in China -- we were in Japan when we

23   got the same notice as them.  We would have been very open to a

24   request for a continuance, had there been one.  There was no

25   such communication.  This was scheduled as an evidentiary

1    hearing.  It's been around for ages.  I would submit this is

2    nothing other than more of the dodging and weaving that will be

3    the subject of our motion to compel when that comes up.

4        MR. WANG:  Respectfully, all plaintiff's witnesses are

5    local and our witnesses are in China.

6        THE COURT:  Please feel free to interrupt me.  Well, I

7    have given you short notice.  If either side had asked for more

8    time, I would have tried to work that out for you.  One reason

9    we have given you such short notice, would be -- excuse me.  I

10   have some other matters in my schedule and I wanted to go on and

11   get this out of the way, because I'm not going to be able to

12   take it up in the next little while, like I would be able to

13   this week.

14       MR. WARD:  Right.  Well, Your Honor, fortunately we were

15   able to settle a patent case with Your Honor yesterday.  We are

16   glad we were able to get that done.  But before we close the

17   evidence, I would like to have the opportunity to make available

18   to the Court the settlement between Southern and Yotrio that

19   constitutes the license that immunizes --

20       THE COURT:  Why don't I just do this?  Honestly, if I'm

21   going to grant this, I'm probably going to have to rule on the

22   motion you filed during the night about standing.  So I can

23   leave the record open on this matter for some days.  If you want

24   to file some kind of declaration from your first witness, this

25   engineer's declaration, this hearing isn't about non

1    infringement.  That's not the issue here.

2           MR. WARD:  Your Honor, you've mentioned the motion on

3    summary judgment, and counsel was asked why wasn't this

4    presented, this information about title and licensing presented

5    earlier in the case.  The reason why it wasn't is because this

6    information became available to us in discovery only relatively

7    recently, so --

8           THE COURT:  I'm curious how recently.

9           MR. WARD:  I can't say as I stand here without -- I

10   don't want to misspeak, but it certainly was not at the

11   beginning of this case and certainly not something that we knew

12   about.

13          THE COURT:  Maybe not six months ago, but when you say

14   recently, that could be one month, two months.

15          MR. WARD:  It could have been.  If the Court asks me to

16   report that, I will report that.

17          THE COURT:  It's been early enough where I didn't get it

18   in the middle of the night last night.

19          MR. WARD:  Well, we had a hearing coming up and we only

20   had two days, Your Honor.

21          THE COURT:  I understand.

22          MR. WARD:  One day.

23          THE COURT:  If it wasn't for the last minute, there just

24   wouldn't be any time at all.  Okay.  Well, I can leave the

25   record open in the matter.  If you want to file a declaration,

1    can you do that within --

2         MR. HALL:  Your Honor, if the Court is interested, in

3    the interest of expediting this, Mr. Brazier has the official

4    records from the U.S. PTO showing all of the assigned patents

5    and demonstrating that they are all in the name of ATLeisure,

6    and it is the proper plaintiff in this party, and it's what we

7    would have submitted in response to the Motion for Summary

8    Judgment had it come before yesterday, and we have it and can

9    submit it here.

10        MR. WARD:  Could I assist the Court in that regard?

11   First of all, counsel says he's not a patent lawyer.  Now I

12   believe that.  The statute here is not a Torren statute, where

13   there is an official record that is the thing, that is the

14   title.  It's a race-notice statute.  And all recordation that

15   the U.S. PTO does is cut off other assignments.  I have to tell

16   you there is an assignment out there that is not cut off, and

17   that's the problem, so I don't care about their records.

18        THE COURT:  Well, so they can submit them into the

19   record.

20        MR. WARD:  Absolutely.

21        THE COURT:  In five days, and you can submit to whatever

22   you want to put into the record with regard to this issue within

23   the next five days, any declarations or whatever.  Keep your

24   documents, file them in the proper manner.

25        MR. HALL:  Okay.  Our instruction is to file within five

1    days.

2         THE COURT:  Yeah.  The record in this hearing is left

3    open for five days for you to file any further declarations,

4    affidavits, depositions, or proper exhibits.  Anything else?

5         MR. HALL:  Does Your Honor want any closing arguments or

6    just to rest it at that?

7         THE COURT:  At twenty minutes to five, I have a bad

8    cold.  You ask me those questions?  But you have come a long

9    way.  Go ahead.  I'm sorry, go ahead.

10        MR. HALL:  Your Honor, I don't want to belabor the

11   thing.

12        THE COURT:  Go ahead.  Take five or ten minutes and tell

13   me.

14        MR. HALL:  Your Honor, the Court was focused on the

15   issue of irreparable harm.  And what I think I would submit to

16   the Court we have heard today consistent with the prior

17   affidavits and completely un refuted by the defendants is this

18   is irreparable harm.

19        THE COURT:  Let me ask you something.  I didn't really

20   ask this before.  The way the record now stands, I believe, is

21   the only client, only customer they are selling to is Bed, Bath

22   and Beyond.  Is that true?

23        MR. HALL:  That's correct, Your Honor.  No, Your Honor,

24   that is not correct, as a matter of fact.  Wal-Mart -- here has

25   been the problem, Your Honor.  This is the subject of the Motion

1   to Compel.  When we filed our initial requests for who have you

2   sold to, what products are you selling, none of this was

3   revealed, and, in fact, counsel came and said this is the only

4   thing, Bed, Bath and Beyond has been the only customer thus far.

5   But, number one, we now know that at least the parent, it's very

6   difficult to tell how they're moving these around, but at least

7   the parent is out there selling them, and, quite frankly, Bed,

8   Bath and Beyond is a heck of a chunk, and the whole idea --

9          THE COURT:  But you never sold to Bed, Bath and Beyond,

10   so you haven't lost any business.

11          MR. HALL:  I would say this, Your Honor.

12          THE COURT:  It's expected that you would have gotten

13   that business.

14          MR. HALL:  Well, but what they are selling to Bed, Bath

15   and Beyond, Your Honor, is our patented technology.  So what

16   that tells you is that Bed, Bath and Beyond desired our patented

17   technology.  If they weren't pirating it, Bed, Bath and Beyond

18   would be my customer, would be our customer.  Now, prior to my

19   buying and prior to Apple coming out with its iPhones, I bought

20   from Motorola, but as soon as I got those, I was out after the

21   Apple iPhones.  That's the entire purpose of the whole patent

22   statute.  For them to come and say, well, it's not your client,

23   therefore we can violate your patent, well, what would that do

24   to a patent holder on day one?  Patent holder on day one comes

25   out with his new product, everybody infringes and says, well,

1   heck, these weren't your customers anyway.  It is too

2   speculative that you ever would have been able to sell to these

3   customers.  Patent holder, it is no good, we have undermined the

4   entire system.  And that, I would say, is a completely facetious

5   argument here, and that's why when our founding fathers put them

6   in, it is a brilliant system to me.  The idea is you come out

7   and you publish out your information.  Others can learn from it,

8   and the reason you'll do it is because you can exclude them.

9        And they have really violated that very thing.  And to

10  then argue that because we already sold to that customer he

11  doesn't count, is improper.  To then argue because we have --

12  it's our parent company that is selling to our other major

13  customer, when the evidence that's in the record is that they

14  facilitate and make those sales, that's improper.

15       And here is the other flip side of it.  If the

16  injunction ensues, if the only person they are selling to is

17  Bed, Bath and Beyond, what is the possible harm to them if they

18  don't intend to go out and sell to all of the rest of our

19  customers, which it appears is exactly what they are doing.

20       Your Honor, I think the case here, I don't know how you

21  do a better job of arguing that there is irreparable harm, and I

22  cannot believe that the standard is for a patent holder to get

23  an injunction he must go out and include every single competitor

24  that is violating his rights in that particular suit or he

25  loses.  And, in fact, there is case law which I would be happy

1　to submit that that is exactly what the law says you don't have

2　to do.

3　　　　　THE COURT:  Well --

4　　　　　MR. HALL:  You get to pick them.

5　　　　　THE COURT:  In a preliminary injunction stage, I think

6　it is a little different than that.

7　　　　　MR. HALL:  Your Honor, I would submit it is not.  I

8　would submit it is not.  And I would also submit that the

9　uncontradicted evidence is that when you get one that comes into

10　the market and starts doing it, the others follow into the

11　market.  This is not something new.

12　　　　　THE COURT:  If that argument holds water, then this case

13　that the Circuit has put out saying that irreparable harm

14　doesn't -- I mean, I'm sorry.  Finding that there is an

15　infringement on the patent doesn't necessarily lead to an

16　injunction, a preliminary injunction.  It's meaningless.  You'd

17　have that argument in each and every case.

18　　　　　MR. HALL:  I would put the flip side of that too, Your

19　Honor, for consideration, which is this:  If you say that you

20　must attack or must bring in every single one at the same time,

21　then how do you manage that type of litigation as a small

22　company, and when can you ever get a preliminary injunction, and

23　have we not undermined our entire patent system in that way?

24　　　　　THE COURT:  You make a good point.

25　　　　　MR. HALL:  Thank you, Your Honor.

1        MR. WARD:  If I may, Your Honor, briefly, preliminary

2   injunctions are rarely granted.  That's a fact.

3        THE COURT:  Well, they are often reversed.  I have found

4   that out the hard way.

5        MR. WARD:  Yes.  I have had the pleasure of doing that

6   myself.  But the reason they are rare is exemplified in the eBay

7   case, a fairly recent Supreme Court case where the Court once

8   again said that even after a trial, even after a full trial and

9   a finding of infringement and injunction, and the injunction

10  being the atomic bomb of the law, if you will, is not automatic,

11  but it is to be granted to comport with the principles of

12  equity.  And the Court has rightfully focused upon those

13  principles of equity here today.

14        And in terms of irreparable harm, well, they haven't met

15  their burden.  Everything they have presented is speculation.

16  Everything they have presented is an attempt to prognosticate,

17  predict the future, and to crystal ball it.  Counsel makes a

18  very eloquent plea as to our founding fathers, the purpose of

19  the patent system, et cetera.  But his argument fails to

20  consider the salient point in this case, and that's the presence

21  here of non infringing substitutes.  Specifically, there is no

22  evidence that these customers that they claim that they lose and

23  without which they would be irreparably harmed, would even buy

24  the patented item, because of the presence of non infringing

25  substitutes, they buy some other umbrella.

1          So under those facts, counsel's argument must fall.

2     There is, in fact, no showing of irreparable harm because they

3     have lost a customer, because they can't show they would ever

4     get that customer.  In addition, I believe the evidence is very

5     clear that ACE doesn't sell these products.  ACE doesn't import

6     these products.  Counsel has impliedly admitted in his argument

7     that the seller here is a company that's not a party to this

8     litigation.  He says it's the parent.

9          THE COURT:  That's as to Wal-Mart, I understood.

10          MR. WARD:  Right.

11          THE COURT:  Not to Bed, Bath and Beyond.

12          MR. WARD:  Well, the evidence is going to show, and

13     thank you for prompting me on that, the evidence is going to

14     show that ACE didn't sell to Bed, Bath and Beyond either.  That

15     was Everluck.  Everluck is the seller.  Now, I guess the

16     argument is, oh, well, it's the same thing, isn't it?  Well, not

17     according to principles of corporate law.  The parent is not --

18     the subsidiary is not suable for the acts of the parent, and

19     unless it is shown that there is identity or collapsing the

20     corporate structure.  So it would be -- therefore, it would be

21     our respectful urging to the Court --

22          THE COURT:  Wait a minute.  Document 43 filed November

23     30th, 2012.  Now I turned the page and lost it.  Mr. Wang, under

24     penalty of perjury, states in paragraph 3:  ACE Evert sells the

25     solar lighted rectangular cantilever umbrella with umbrella base

1    and cover to Bed, Bath and Beyond.  ACE Evert does not currently

2    sell the product to any other wholesalers.  That's not true?

3            MR. WARD:  I don't believe it is.  I don't believe ACE

4    ever sells at all.  I think it was -- I think this affiant --

5            THE COURT:  You better go back.

6            MR. WARD:  I think this affiant, not being a lawyer,

7    made that mistake.

8            THE COURT:  Let's see, I am the vice president of

9    Evertrust Group, parent to ACE Evert.  Also director of sales of

10   ACE Evert.  Is that not true either?  You all have been filing

11   documents that aren't true?

12           MR. WARD:  I'm not going to vouch for the truth or

13   falsity of something in somebody else's affidavit.  I believe

14   that to be true.  I believe that the employment is true.  I

15   believe that the conclusion as to who made a sale is an

16   incorrect conclusion as a matter of law.

17           THE COURT:  Well, the director of sales ought to have

18   some knowledge about it, or able to obtain accurate knowledge.

19           MR. WARD:  Yeah.  He's not a lawyer.

20           THE COURT:  Oh, only lawyers -- they have got a monopoly

21   on accuracy?

22           MR. WARD:  I think we have seen today that's not

23   correct.

24           THE COURT:  Yeah.

25           MR. WARD:  Anyway, I have nothing further at this point,

1     Your Honor.  Maybe that's a point that needs to be corrected on

2     the record.

3              THE COURT:  All right.

4              MR. WARD:  Thank you so much.  I hope you are feeling

5     better.

6              THE COURT:  Thank you.

7              MR. HALL:  Thank you, Your Honor.

8              THE COURT:  Okay.

9

10                    C E R T I F I C A T E

11

12         I, Martha J. Frutchey, do hereby certify that I am a U.S.

      District Court Reporter for the Northern District of Georgia,

13    Atlanta Division; that I reported the foregoing and the same is

14    a true and accurate transcription of my shorthand notes as

15    taken aforesaid.

16

17

18                        _____

19                        Martha J. Frutchey

20

21

22

23

24

25